Douglas R. FAVELL, Jr., Gilles Marotte,
Frederick E. Speck, Francis W.
Speer, Garnet E. Bailey, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 525–76, 531–76, 42–77, 43–77
and 122–77.

United States Claims Court.

April 26, 1989.

Charles L. Abrahams, La Mesa, Cal., for plaintiffs.

Mildred L. Seidman, and Gilbert W. Rubloff, Washington, D.C., with whom was the Asst. Atty. Gen., for defendant.

OPINION

HORN, Judge.

These cases first came before this court's predecessor, the United States Court of Claims, more than a decade ago. The Complaints were filed on December 20, 1976 for dockets No. 525–76 and No. 531–76, January 21, 1977 for dockets No. 42–77 and No. 43–77, and March 3, 1977 for docket No. 122–77. Subsequent to the enactment of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, the United States Claims Court inherited cases pending before the United States Court of Claims, including these five cases. Upon the retirement of the Honorable Philip R. Miller, the above-captioned cases, along with 189 related cases, were transferred to this Judge. Since that time, three additional related cases have been filed with the court, bringing the total number of related cases to 197. Each of these tax refund actions was brought by a professional hockey player (in some cases together with his spouse) claiming the overpayment of taxes in the specific years enumerated in each of the separately filed complaints.

These cases have been plagued by years of delays, as a result of the complexity of the issues, the multiplicity of the plaintiffs, the enormous number of supporting documents filed in the cases, the need for successive judges to acquaint themselves with the filings, and by the numerous and lengthy requests by both parties for extensions of time to file motions and to prepare for a trial scheduled by Judge Miller. By Order dated April 1, 1985, prior to trial, these five representative plaintiffs were directed to submit briefs on an issue common to most of the then pending hockey player tax cases. As stated in the April 1, 1985 Order, the plaintiffs were to file a motion for summary judgment, followed by a possible cross-motion to be filed by the defendant, on the following issue: whether, as a matter of law, plaintiffs, who are non-resident aliens, are entitled to exclude from United States tax liability proportionate income payments allegedly attributable to activities in which they took part during the off-season in Canada (the income allocation issue).

As is more fully discussed below, based on the motion for partial summary judgment, the cross-motion for partial summary judgment and the responses submitted to each, as well as the numerous other documents, filed with the court, and the oral argument held before this Judge, the Plaintiffs' Motion for Partial Summary Judgment is, hereby, DENIED, and the Cross-Motion of the United States for Partial Summary Judgment is, hereby, GRANTED.

## Background

### I. Procedural Background

The five above-captioned cases, which are part of a group of cases referred to as the "hockey player tax refund cases," were brought in this court by professional hockey players, claiming the refund of income tax monies allegedly overpaid a number of years ago. The first hockey player tax refund case was filed in December of 1976,[1] and is not one of these consolidated five cases.

Prior to August of 1977, all plaintiffs in the then pending hockey player tax refund suits agreed with the defendant to consolidate ten cases in order to conduct discovery in a more orderly and streamlined fashion.[2] There followed a year and several months of discovery and related disputes between the parties.

Beginning November 7, 1979, the parties and the court, by Order filed on that date, began to treat the five above-captioned cases, consolidated for purposes of preparing for a scheduled trial to be held in Canada during the spring of 1985.[3] Between 1979 and 1987, activity in each of the now pending 192 other hockey player tax cases was ordered suspended until the present five cases were either tried, or, following the court's April 1, 1985 Order, certain of the common issues in the cases were disposed of first by partial summary judgment. These five cases seem to have been chosen to be the "test-cases" or "representative cases" because they typify the factual bases for the legal issues involved in all of the hockey player tax refund cases.

Since the consolidation of these five cases, Judge Philip R. Miller, allowed numerous extensions of time requested by both parties. Among other procedural highlights, Judge Miller allowed the plaintiffs' April 25, 1980 Motion to Re–Open Discovery, but denied their motions for sanctions against non-party individuals who failed to comply with discovery. Judge Miller then held several supplemental pretrial conferences and determined that the plaintiffs had failed to comply with previous court orders.

Since Judge Miller found that the parties seemed unprepared to work together for purposes of the scheduled trial, and in order to expeditiously dispose of the five representative, and possibly all of the other hockey player tax refund suits, Judge Miller decided to cancel the scheduled trial and to order the plaintiffs to submit the "income allocation issue" for disposition by a motion for partial summary judgment and, if appropriate, defendant's cross-motion.

On October 21, 1985, the plaintiffs filed the Motion for Partial Summary Judgment, together with four separately bound volumes of documents and testimony from a trial held earlier in the United States Tax

---

1. *William Barry Ashbee and Donna Ashbee v. United States,* docket No. 515–76, filed in 1976, was followed by 22 other cases filed that same year, 101 cases filed in 1977, 29 cases filed in 1978, none filed in 1979, 8 filed in 1980, another 8 filed in 1981, 19 filed in 1982, 3 filed in 1983, none filed in 1984 or 1985, 4 filed in 1986, and 2 filed in 1987.

2. The ten cases consolidated for discovery purposes were:

| Plaintiff | Docket No. |
|---|---|
| Ronald J. Boehm | 521–76 |
| Douglas R. Favell, Jr. | 525–76 |
| Gilles Marotte | 531–76 |
| Curt A. and Susan C. Bennett | 5–77 |
| William E. and Cinda L. Wyrozub | 36–77 |
| Frederick E. and Linda L. Speck | 42–77 |
| Francis W. Speer | 43–77 |
| Ronald V. Garwasiuk | 94–77 |
| Garnet E. Bailey | 122–77 |
| Ross Lonsberry | 234–77. |

3. Formal consolidation of the above-captioned five cases came when, on October 16, 1985, the previously assigned Judge allowed the plaintiff's October 11, 1985 Motion to Consolidate these five cases. The plaintiffs in these cases then became known as the "test-case plaintiffs."

Court.[4] Plaintiffs have indicated that they felt the similarly situated hockey players had lost the income allocation issue on appeal before the United States Courts of Appeals for the Second and the Fourth Circuits due to what plaintiffs perceived the courts felt was a lack of evidence in the tax court record.[5] The plaintiffs in this action, therefore, decided to accompany their Motion for Partial Summary Judgment with multiple volumes of documentation, testimony, affidavits, and declarations from individuals they purportedly would have used as witnesses in this consolidated case if a trial had been necessary to dispose of any factual and legal issues. The plaintiffs proposed to remedy what they claim was the Second Circuit's only reason for failing to find for the plaintiff in *Stemkowski* on the income allocation issue, *Stemkowski v. Commissioner*, 690 F.2d 40, 46 (2d Cir.1982), by submitting for this court's assessment of the same issue, any and all documentary evidence available to remedy what plaintiffs determined the Second Circuit had concluded was not presented in the *Stemkowski* record.

On April 24, 1986, following several additional motions for extensions of time made by both parties, the defendant filed a response to Plaintiffs' Motion for Partial

Summary Judgment and a Cross–Motion of the United States for Partial Summary Judgment, together with a Statement of Genuine Issues and Proposed Findings of Uncontroverted Facts.

On July 21, 1986, these five cases, as well as the other hockey player tax refund suits then pending before this court, were reassigned to this Judge. Since the reassignment, the plaintiff in *Stemkowski v. Commissioner*, 76 T.C. 252 (1981), *aff'd in part, rev'd in part, and remanded*, 690 F.2d 40 (2d Cir.1982), filed a second action in this court claiming the overpayment of income tax due to the incorrect allocation of the hockey player's salary received pursuant to National Hockey League Standard Player's Contracts.[6] The plaintiff in *Hanna v. Commissioner*, 76 T.C. 252 (1981), *aff'd in part, rev'd in part, and remanded*, 763 F.2d 171 (4th Cir.1985), filed his claim in this court on August 16, 1977.[7]

On November 3, 1986, after this court had granted several more extensions of time to the plaintiffs, the plaintiffs responded to the defendant's cross-motion for partial summary judgment and made a Motion to Strike the Affidavit of defendant's attorney, Gilbert Rubloff. The Rubloff affidavit had been submitted by the defen-

---

4. The plaintiffs in the Tax Court consolidated action did not prevail on the income allocation issue now before this court. The single Tax Court opinion for both cases was appealed by each of the plaintiffs to different circuit courts of appeals. The two courts of appeals partially affirmed and partially reversed both cases. *Stemkowski v. Commissioner*, 76 T.C. 252 (1981), *aff'd in part, rev'd in part, and remanded*, 690 F.2d 40 (2d Cir.1982) and *Hanna v. Commissioner*, 76 T.C. 252 (1981), *aff'd in part, rev'd in part, and remanded*, 763 F.2d 171 (4th Cir.1985).

5. Plaintiffs cite to the following language in the Second Circuit Opinion:

Fitness is not a service performed in fulfillment of the contract but a condition of employment. There was no evidence that [plaintiff] was required to follow any mandatory conditioning program or was under any club supervision during the off-season. [The plaintiff] was required to observe, if anything, only general obligations, applicable as well throughout the year, to conduct himself with loyalty to the club and the league and to participate only in approved promotional activities.

*Stemkowski v. Commissioner*, 690 F.2d at 46. The Fourth Circuit Court of Appeals in *Hanna v. Commissioner*, 763 F.2d 171 (1985), issued a per curiam opinion which endorsed the Second Circuit's opinion.

6. Peter D. Stemkowski first filed a complaint in this court on May 13, 1977, No. 262–77, claiming the refund of alleged overpayment of taxes during the tax years 1969, 1970, and 1972. Following the reassignment of all of the hockey player tax refund suits to this Judge's docket, Peter Stemkowski, along with his wife Gail, filed a second tax refund suit in this court, No. 482–86T. In this second action, Peter and Gail Stemkowski allege the overpayment of taxes during the tax years 1973, 1974, 1977, and 1979.

7. It is also interesting to note at the outset that counsel for the plaintiffs in both the *Stemkowski* and *Hanna* cases in the Tax Court, *Stemkowski v. Commissioner*, 76 T.C. 252 (1981), and in this court, is the same as the attorney who represents the above-captioned five plaintiffs as well as the other 189 hockey player plaintiffs in this court.

dant, on April 24, 1986, in support of its cross-motion for partial summary judgment, together with a formal response to the plaintiffs' motion. Plaintiffs' response to the defendant's cross-motion, filed on November 28, 1986, was accompanied by three volumes of documents and affidavits or declarations as well as certified copies of the testimony taken in the *Stemkowski* and *Hanna* Tax Court consolidated trial.

Oral argument on the plaintiff's Motion for Partial Summary Judgment and the defendant's cross-motion for summary judgment was scheduled and heard. At the oral argument, plaintiffs' counsel reiterated the Motion to Strike the Affidavit of defendant's attorney, Gilbert Rubloff. Defendant had previously responded to Plaintiffs' Motion to Strike the Affidavit of Gilbert Rubloff in papers filed on December 2, 1986. At the hearing, Mr. Rubloff, representing the defendant, stated that, for purposes of disposing of the present motion and cross-motion for partial summary judgment, any factual disagreements were inconsequential. Therefore, for purposes of the motions considered in this opinion, Mr. Rubloff, on behalf of the defendant, stated that the court should proceed and accept plaintiffs' version of the facts as submitted. As part of the defendant's agreement to accept plaintiffs' version of the relevant facts, the court denied the plaintiff's Motion to Strike the Tax Court petitions of the plaintiffs in *Stemkowski v. Commissioner* and *Hanna v. Commissioner*, 76 T.C. 252 (1981), which was submitted by the defendant in response to the Motion to Strike the Affidavit of Mr. Gilbert Rubloff.

## II. Factual Background

The plaintiffs' Proposed Facts, included in the brief in support of their Motion for Partial Summary Judgment, and Proposed Findings of Uncontroverted Facts to which the defendant has stipulated its agreement, only for the purposes of deciding these dispositive motions, are substantially similar. Although the court has reviewed all the material submitted, in this opinion, the court only addresses facts pertaining to the five test-case plaintiffs and the sport of Hockey.

It is generally understood that professional hockey players contract with a hockey club or organization to display to the public their athletic skills, for an agreed amount of compensation. Such presentations take place in an arena wherein the individual players join their teammates for a hockey game. Professional hockey players play in five major and minor leagues: The National Hockey League (NHL) and The World Hockey Association (WHA), are the two major leagues; The World Hockey League (WHL), The Central Hockey League (CHL), and The American Hockey League (AHL), are the minor leagues.

The professional hockey player's year can be subdivided into four distinct periods: (1) training camp; (2) the regularly scheduled championship games, which generally begin in the first or second week of October and end some time in April; (3) play-off or Cup games; and (4) the off-season, which begins at the close of the competitive playing season and ends with the first day of training camp. If a team does not qualify for the play-off or Cup games, the off-season begins in early April. If, however, the hockey team makes the play-offs, the off-season could begin as late as June.

Training camp normally commences thirty days prior to the beginning of regularly scheduled championship games, which begin in October of each year. The training camp period is used by each hockey club's coaching staff to form a "line" which consists of the club's superior players and those players who perform best as a team. Training camp is not used to train or to give individual players thirty days to achieve the best possible physical condition. As required by the terms of the Standard Player's Contracts signed by the players, players are required to arrive at training camp in top physical condition and to be ready to compete for "line" positions. Furthermore, the players must maintain that excellent physical condition throughout the season.

The regularly scheduled league championship games are the regular season games in which the hockey teams compete for play-off positions. The Cup games con-

sist of the play-off games in which the select hockey teams compete to determine which team is the best in the league. The off-season is the period of time between the regular season or play-off games and training camp in which hockey players do not play competitive professional hockey. During the off-season, the players, who are plaintiffs in these cases, returned to their homes in Canada.

During the tax years in question, each of the five representative plaintiffs were professional hockey players. Each of them was a non resident alien of the United States, playing for hockey clubs from which each player received compensation from sources within the United States for labor and personal services. Each plaintiff signed a standard player's contract some time before or at the beginning of training camp, for a period of one year, or longer, which commenced on October 1, of each year. Each player worked for hockey clubs in one or more of the leagues listed above, pursuant to a contract covering the taxable years at issue. Each plaintiff complied with the terms of the standard contracts under which he performed his services. Since all test case plaintiffs signed National Hockey League Standard Player's Contracts during at least one, if not more, of the respective tax years in question, a sample contract is quoted in its entirety below.[8]

### NATIONAL HOCKEY LEAGUE
#### Standard Player's Contract

This Agreement

Between _____
hereafter called the "Club", a member of the National Hockey League, hereinafter called the "League"

and

_____
hereafter called the "Player".

of_____in [Province] of _____
[State]

Witnesseth:

That in consideration of the respective obligations herein and hereby assumed, the parties to this contract severally agree as follows:—

1. The Club hereby employs the Player as a skilled Hockey Player for the term of one year commencing October 1st, 19__ and agrees, subject to the terms and conditions hereof, to pay the player a salary of _____ Dollars ($_____.

Payment of such salary shall be in consecutive semi-monthly instalments following the commencement of the regular League Championship Schedule of games or following the date of reporting, whichever is later; provided, however, that if the Player is not in the employ of the Club for the whole period of the Club's games in the National Hockey League Championship Schedule, then he shall receive only part of the salary in the ratio of the number of days of actual employment to the number of days of the League Championship Schedule of games.

And it is further mutual agreed that if the Contract and rights to the services of the Player are assigned, exchanged, loaned or otherwise transferred to a Club in another League, the Player shall only be paid at the rate of

_____Dollars in the _____ League.
or_____Dollars in the _____ League,
or_____Dollars in the _____ League.

2. The Player agrees to give his services and to play hockey in all League Championship, Exhibition, Play–Off and Stanley Cup games to the best of his ability under the direction and control of the Club for the said season in accordance with the provisions hereof.

The Player further agrees,

(a) to report to the Club training camp at the time and place fixed by the Club, in good physical condition,

(b) to keep himself in good physical condition at all times during the season,

(c) to give his best services and loyalty to the Club and to play hockey only for the Club unless his contract is released,

---

**8.** *See* Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.")

assigned, exchanged or loaned by the Club,

(d) to co-operate with the Club and participate in any and all promotional activities of the Club and the League which will in the opinion of the Club promote the welfare of the Club or professional hockey generally,

(e) to conduct himself on and off the rink according to the highest standards of honesty, morality, fair play and sportsmanship, and to refrain from conduct detrimental to the best interests of the Club, the League or professional hockey generally.

The Club agrees that in exhibition games played after the start of the regular schedule (except where the proceeds are to go to charity, or where the player has agreed otherwise) the player shall receive his pro rata share of the gate receipts after deduction of legitimate expenses of such game. This provision re exhibition games is applicable in the National Hockey League only.

3. In order that the Player shall be fit and in proper condition for the performance of his duties as required by this contract the Player agrees to report for practice at such time and place as the Club may designate and participate in such exhibition games as may be arranged by the Club within thirty days prior to the first scheduled Championship game. The Club shall pay the traveling expenses and meals en route from the Player's home to the Club's training camp. In the event of failure of the Player to so report and participate in exhibition games a fine not exceeding Five Hundred Dollars may be imposed by the Club and be deducted from the compensation stipulated herein. At the conclusion of the season the Club shall provide transportation direct to the Player's home.

4. The Club may from time to time during the continuance of this contract establish rules governing the conduct and conditioning of the Player, and such rules shall form part of this contract as fully as if herein written. For violation of any such rules or for any conduct impairing the thorough and faithful discharge of the duties incumbent upon the Player, the Club may impose a reasonable fine upon the Player and deduct the amount thereof from any money due or to become due to the Player. The Club may also suspend the Player for violation of any such rules. When the Player is fined or suspended he shall be given notice in writing stating the amount of the fine and/or the duration of the suspension and the reason therefore.

5. Should the Player be disabled or unable to perform his duties under this contract he shall submit himself for medical examination and treatment by a physician selected by the Club, and such examination and treatment, when made at the request of the Club, shall be at its expense unless made necessary by some act or conduct of the Player contrary to the terms and provisions of this contract or the rules established under Section 4.

If the Player, in the sole judgment of the Club's physician, is disabled or is not in good physical condition at the commencement of the season or at any subsequent time during the season (unless such condition is the direct result of playing hockey for the Club) so as to render him unfit to play skilled hockey, then it is mutually agreed that the Club shall have the right to suspend the Player for such period of disability or unfitness, and no compensation shall be payable for that period under this contract.

If the Player is injured as the result of playing hockey for the Club, the Club will pay the Player's reasonable hospitalization until discharged from the hospital, and his medical expenses and doctor's bills, provided that the hospital and doctor are selected by the Club and provided further that the Club's obligation to pay such expenses shall terminate at a period not more than six months after the injury.

It is also agreed that if the Player's injuries resulting directly from playing for the Club render him, in the sole judgment of the Club's physician, unfit to play skilled hockey for the balance of the season or any part thereof, then during such time the Player is so unfit, but in no event beyond the end of the current season, the Club shall pay the Player the compensation here-

in provided for and the Player releases the Club from any and every additional obligation, liability, claim or demand whatsoever. However if upon joint consultation between the Player, the Club's physician and the Club General Manager, they are unable to agree as to the physical fitness of the Player to return to play, the Player agrees to submit himself for examination by an independent medical specialist and the Parties hereto agree to be bound by his decision. If the Player is declared to be unfit for play he shall continue to receive the full benefits of this Agreement. If the Player is declared to be physically able to play and refuses to do so he shall be liable to immediate suspension without pay.

6. The Player represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. The Player therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunction proceedings from playing hockey for any other team and/or for any breach of any of the other provisions of this contract.

7. The Player and the Club recognize and agree that the Player's participation in other sports may impair or destroy his ability and skill as a hockey player. Accordingly the Player agrees that he will not during the period of this Contract and of the option of renewal thereof engage or participate in football, baseball, softball, hockey, lacrosse, boxing, wrestling, or other athletic sport without the written consent of the Club.

8. (a) The Player hereby irrevocably grants to the Club during the period of this Contract and of the option of renewal thereof the exclusive right to permit or authorize any person, firm or corporation to take and make use of any still photograph, motion pictures or television of himself, and agrees that all rights in such pictures and television shall belong to the Club exclusively and may be used, reproduced, distributed or otherwise disseminat-ed by the Club directly or indirectly in any manner it desires.

(b) The Player further agrees that during the period of this Contract and of the option of renewal thereof he will not make public appearances, participate in radio or television programs, or permit his picture to be taken, or write or sponsor newspaper or magazine articles, or sponsor commercial products without the written consent of the Club. Where the Club grants its written consent to any of the activities recited in this sub-section the Player shall receive his proper share of the proceeds of such activities.

9. It is mutually agreed that the Club will not pay, and the Player will not accept from any person, any bonus or anything of value for winning any particular game or series of games except as authorized by the League By-Laws.

10. The Player agrees that during the currency of this agreement he will not tamper with or enter into negotiations with any player under contract or reservation to any Club of the League for or regarding such player's current or future services, without the written consent of the Club with which such player is connected under penalty of a fine to be imposed by the President of the League.

11. It is mutually agreed that the Club shall have the right to sell, assign, exchange and transfer this contract, and to loan the Player's services to any other professional hockey club, and the Player agrees to accept and be bound by such sale, exchange, assignment, transfer or loan, and will faithfully perform and carry out this contract with the same purpose and effect as if it had been entered into by the Player and such other Club.

It is further mutually agreed that in the event that this contract is assigned, or the Player's services are loaned, to another Club, the Club shall, by notice in writing delivered personally to the Player or by mail to the address set out below his signature hereto advise the Player of the name and address of the Club to which he has been assigned or loaned, and specifying the time and place of reporting to such club.

If the Player fails to report to such other Club he may be suspended by such other Club and no salary shall be payable to him during the period of such suspension.

The Club shall pay the actual moving expenses incurred by a player during the playing season when such move is directed by the Club and is not part of disciplinary action.

12. If the Club shall default in the payments to the Player provided for in Section 1 hereof or shall fail to perform any other obligation agreed to be performed by the Club hereunder, the Player may, by notice in writing to the Club, specify the nature of the default, and if the Club shall fail to remedy the default within fifteen (15) days from receipt of such notice, this contract shall be terminated, and upon the date of such termination all obligations of both parties shall cease, except the obligation of the Club to pay the Player's compensation to that date.

13. The Club may terminate this contract upon written notice to the Player (but only after obtaining waivers from all other League clubs) if the Player shall at any time:

(a) fail, refuse or neglect to obey the Club's rules governing training and conduct of players,

(b) fail, refuse or neglect to render his services hereunder or in any other manner materially breach this contract,

(c) fail, in the opinion of the Club's management, to exhibit sufficient skill or competitive ability to warrant further employment as a member of the Club's team.

In the event of termination under subsection (a) or (b) the Player shall only be entitled to compensation due to him to the date such notice is delivered to him or the date of the mailing of such notice to his address as set out below his signature hereto.

In the event of termination under subsection (c) it shall take effect fourteen days from the date upon which such notice is delivered to the Player, and the Player shall only be entitled to the compensation herein provided to the end of such fourteen-day period.

In the event that this contract is terminated by the Club while the Player is "away" with the Club for the purpose of playing games the instalment then falling due shall be paid on the first week-day after the return "home" of the Club.

14. The Player further agrees that the Club may carry out and put into effect any order or ruling of the League or its President for his suspension or expulsion and that in the event of suspension his salary shall cease for the duration thereof and that in the event of expulsion this contract, at the option of the Club, shall terminate forthwith.

15. The Player further agrees that in the event of his suspension pursuant to any of the provisions of this contract, there shall be deducted from the salary stipulated in Section 1 hereof an amount equal to the exact proportion of such salary as the number of days' suspension bears to the total number of days of the League Championship Schedule of games.

16. If because of any condition arising from a state of war or other cause beyond the control of the League or of the Club, it shall be deemed advisable by the League or the Club to suspend or cease or reduce operations, then:

(a) in the event of suspension of operations, the Player shall be entitled only to the proportion of salary due at the date of suspension,

(b) in the event of cessation of operation, the salary stipulated in Section 1 hereof shall be automatically cancelled on the date of cessation, and

(c) in the event of reduction of operations, the salary stipulated in Section 1 hereof shall be replaced by that mutually agreed upon between the Club and the Player.

17. The Club agrees that it will on or before September 1st next following the season covered by this contract tender to the Player personally or by mail directed to the Player at his address set out below his signature hereto a contract upon the same terms as this contract save as to salary.

The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement. In the event that the Player and the Club do not agree upon the salary to be paid the matter shall be referred to the President of the League, and both parties agree to accept his decision as final.

18. The Club and the Player severally and mutually promise and agree to be legally bound by the Constitution and By–Laws of the League and by all the terms and provisions thereof, a copy of which shall be open and available for inspection by Club, its directors and officers, and the Player, at the main office of the League and at the main office of the Club.

The Club and the Player further agree that in case of dispute between them, the dispute shall be referred within one year from the date it arose to the President of the League as an arbitrator and his decision shall be accepted as final by both parties.

The Club and the Player further agree that all fines imposed upon the Player under the Playing Rules, or under the provisions of the League By–Laws, shall be deducted from the salary of the Player and be remitted by the Club to the N.H.L. Players' Emergency Fund.

19. The Player agrees that the Club's right to renew this contract as provided in Section 17 and the promise of the Player to play hockey only with the Club, or such other club as provided in Section 2 and Section 11, and the Club's right to take pictures of and to televise the Player as provided in section 8 have all been taken into consideration in determining the salary payable to the Player under Section 1 hereof.

20. The Player hereby authorizes and directs the Club to deduct and pay, and the Club hereby agrees to deduct and pay, to the National Hockey League Pension Society, out of the salary stipulated in Section 1 hereof on behalf of the Player the sum of Fifteen Hundred Dollars ($1500.00) (Canadian Funds) or such lesser proportion thereof as the number of days' service of the Player with the Club under this contract bears to the number of days of the League Championship Schedule of games, and to obtain from the National Hockey League Pension Society a proper receipt for such sum in the name of the Player.

21. It is severally and mutually agree (sic) that the only contracts recognized by the President of the League are the Standard Player's Contracts which have been duly executed and filed in the League's office and approved by him, and that this Agreement contains the entire agreement between the Parties and there are no oral or written inducements, promises or agreements except as contained herein.

In Witness Whereof, the parties have signed this . . . . . . . . . . . . day of . . . . . . . . A.D. 19 . . . . .

WITNESSES: . . . . . . . . . . . . . . . . . . . . . . . . . . .

Club

. . . . . . . . . . . . . . . By . . . . . . . . . . . . . . . . . . . . . . . .

President

. . . . . . . . . . . . . . . . . . . . . . . . . . .

Player

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Home Address of Player

## III. The Five Representative Plaintiffs.

Douglas R. Favell, case no. 525–76, the first of the five above-captioned test-case plaintiffs, claims the overpayment of United States income tax for the years 1968 through 1971. During the tax years in question, Mr. Favell signed National Hockey League Standard Player's Contracts agreeing to play goalie for the Philadelphia Flyers for the one year periods beginning September 15, 1967, October 12, 1968, September 15, 1969, October 8, 1970, and September 9, 1971.

As stated in the plaintiffs' factual statement, Mr. Favell's hockey club asked him to attend certain off-season promotional functions and the hockey club also showed an interest in his physical condition during off-season. During the off-season of one of the tax years at issue, the general manager of the Philadelphia Flyers, Keith Allen, corresponded with Mr. Favell, indicating the hockey club's interest in Mr. Fa-

vell's physical condition. Following an injury in 1970, Mr. Favell was directed by the team physician, on May 13, 1975, to exercise in order to help heal an injury to his leg. As one of the test-case plaintiffs, Mr. Favell claims that after recognizing the hockey club's emphasis on a player's physical condition and how his condition might translate into a higher salary on his next contract, he performed vigorous off-season conditioning programs to arrive at training camp in good physical condition and to impress the club's management.

Jean Gilles Marotte, who played defense and the left wing position, is the second test-case plaintiff, case no. 531–76. Mr. Marotte claims the overpayment of United States income tax for the years 1968 thru 1971. Mr. Marotte signed a National Hockey League Standard Player's Contract for two years, commencing October 1967 and a one-year contract, beginning October 1, 1969, both with the Chicago Blackhawks. On February 20, 1970, Mr. Marotte was traded from the Chicago Blackhawks to the Los Angeles Kings. In early August of 1970, Mr. Marotte signed a one year contract with the Los Angeles Kings, which was to commence October 1, 1970.

Following an incident in which Mr. Marotte was fined for missing "physical training" in September of 1970, Mr. Marotte began playing hockey for the Kings pursuant to the August 1970 contract. In 1971, after signing another National Hockey League Standard Player's Contract, this time for a two-year term, the Los Angeles Kings, acting through its General Manager, Larry E. Regan, advised Mr. Marotte that the club renounced all rights and benefits under the 1971 contract pursuant to paragraph 13(c) of the contract. Subsequently, Mr. Marotte signed a new three-year contract with the Los Angeles Kings, commencing October 1, 1971, with payments subject to a National Hockey League Executive Order.

Mr. Marotte contends that during the off-season period of the tax years in question, he was performing conditioning exercises, which he believed were required and compensable under his Standard Player's Contracts.

Frederick E. Speck, case No. 42–77, is the third test-case plaintiff. The caption of case number 42–77 includes Mr. Speck's wife, Linda Speck, because they filed joint income tax returns for the tax years in question. The Speck's claim the overpayment of income taxes for the tax years 1968, 1971 and 1972.

During his professional hockey career, Mr. Speck played center with the Detroit Red Wings of the National Hockey League, and their minor league team, the Fort Worth Wings of the Central Hockey League. For the 1968–1969, 1969–1970, 1970–1971 and 1971–1972 seasons, Mr. Speck signed National Hockey League Standard Player's Contracts. On August 1, 1972, Mr. Speck signed a two-year employment contract with the Minnesota Fighting Saints of the World Hockey Association for the 1972–1973 and 1974–1975 seasons. Mr. Speck played for Minnesota during the 1972–1973 season.

The World Hockey Association Uniform Player's Contract is substantially the same as the National Hockey League Standard Player's Contract quoted above in its entirety. The only significant differences to which the plaintiffs have directed the court's attention are found in paragraph 2 of the World Hockey Association Uniform Player's Contract,[9] which reads as follows:

During the term of this agreement, the Club employs Player as a skilled hockey player, subject to all, the provisions of this contract. Player's duties under this contract shall include, but not be limited to:

2.1 The participation in and playing of practice sessions, exhibition, league and play-off games, to the best of his

9. See *supra* pp. 705–06 for the National Hockey League Standard Player's Contract paragraph 2 which, with the exception of the last two sentences, is the same as paragraph 2 of the

American Hockey League, Central Hockey League, and Western Hockey League Standard Player's Contracts.

ability, under the direction and control of the Club during the term of this contract.

2.2 To report, in good physical condition and training at the time and place fixed by the Club, and to render full time services required of a skilled hockey player.

2.3 To keep himself in appropriate physical condition at all times during the training, exhibition, league and play-off season in which the Club participates.

2.4 At the request of the Club to participate in promotional activities and and cooperate in general with Club and League activities.

2.5 To give his best services, best performance and loyalty to the Club both in and out of season, and to play hockey only for the Club, unless he is released or his contract is sold by the Club, or unless he is loaned by the Club to another team or affiliate of the Club.

Francis William Speer, case No. 43–77, the fourth test-case plaintiff, claims the overpayment of United States income tax for the years 1968, 1969 and 1971. Mr. Speer played defense during his career as a professional hockey player. During 1967, Mr. Speer was a member of the Pittsburg Penguins of the National Hockey League and on October 10, 1967, the Penguins loaned Mr. Speer to the Baltimore Clippers of the American Hockey League. On October 1, 1968, Mr. Speer signed a National Hockey League Standard Player's Contract with the Pittsburgh Penguins. After being loaned by the Pittsburgh Penguins to the Baltimore Clippers, on October 7, 1968, Mr. Speer signed a one-year American Hockey League Standard Player's Contract with the Baltimore Clippers. Subsequently, on November 22, 1968, the Pittsburgh Penguins recalled Mr. Speer from the Baltimore Clippers, and, on January 10, 1969,

loaned him to another American Hockey League team in Amarillo, Texas.[10] Mr. Speer was then placed in a National Hockey League Intra–League draft on June 11, 1969, and ended up signing a National Hockey League Standard Player' Contract with the Boston Bruins on September 24, 1969. This contract had a one-year term commencing October 1, 1969 and ending September 31, 1970.

During the 1970–1971 season, Mr. Speer played with the Boston Bruins of the National Hockey League and the Hershey Bears and Providence Reds of the American Hockey League.[11] On October 8, 1971, Mr. Speer signed a National Hockey League Standard Player's Contract with the Boston Bruins. He was subsequently loaned to the Boston Braves and signed an American Hockey League Standard Player's Contract with that team. His contract was then sold to the Providence Reds of the American Hockey League on November 5, 1971.

Garnet "Ace" Bailey, case No. 122–77, is the fifth test-case plaintiff. In his complaint, Mr. Bailey claims the overpayment of United States income tax for the 1968, 1969 and 1971 tax years. On October 4, 1967, Mr. Bailey signed a one year contract to play a wing position with the Boston Bruins of the National Hockey League, but on October 11, 1967, Bailey was loaned to the Oklahoma City Blazers of the Central Hockey League. On October 15 of the following year, the Boston Bruins suspended Mr. Bailey for refusing to sign his 1968 contract and for leaving training camp. On October 21, 1968, the Boston Bruins lifted the suspension and transferred Mr. Bailey from the Oklahoma City Blazers to the Hershey Bears of the American Hockey League. On November 2, 1968, he was

---

10. The American Hockey League contract is, in relevant part, substantially the same as the National Hockey League Standard Player's Contract which is quoted above in its entirety. *See supra* pp. 705–09.

11. The facts, agreed to by the parties, do not specifically state which type of league contract Mr. Speer signed for the 1970–1971 hockey season. The facts do, however, indicate that Mr. Speer played with the Boston Bruins of the

National Hockey League and the Hershey Bears and Providence Reds of the American Hockey League during the 1970–1971 season. The controlling paragraphs of the National Hockey League and American Hockey League Standard Player's Contracts, however, are substantially similar and we note that Mr. Speer began the season playing for the National Hockey League team.

recalled by the Boston Bruins and, on November 3, 1968, he signed a National Hockey League contract with the Bruins. Several days later, he was loaned back to the Hershey Bears. Subsequently, he signed National Hockey League Standard Player's Contracts with the Boston Bruins, on September 17, 1969 for the 1969–1970 season, on October 1, 1970 for the 1970–1971 season, and on August 31, 1971 for the 1971–1972 season.

In general, all five test-case plaintiffs claim the refund of tax monies allegedly overpaid to the United States with respect to specific tax years enumerated in each of the separately filed complaints. Each plaintiff's claimed amount includes the alleged overpayment of taxes to the defendant which correspond to certain claimed and originally disallowed tax deductions as well as an amount which each plaintiff has computed to be the correct refund figure, should the court agree with plaintiffs' position as to the exclusion of gross income dollars in accordance with the plaintiffs' position on the correct application of the income allocation formula discussed herein.

Similar deduction claims were considered in the Stemkowski case, *Stemkowski v. Commissioner*, 76 T.C. 252, 299–303 (1981), *aff'd in part, rev'd in part, and remanded*, 690 F.2d 40, 46–47 (2d Cir.1982), *on remand*, 82 T.C. 854 (1984), and, in accordance with the parties oral representations and written dispositive motions, such claims for deductions are not at issue in these consolidated cases at this time. In their complaints, plaintiffs also request relief from the court in form of interest on their claims as provided by law, "and for ... costs herein incurred, and for such other and further relief as the court may deem just and proper."

The following is a graphic representation of the tax years at issue with respect to each of the five test-case plaintiffs including: (1) under which league contract the plaintiff performed during each of the corresponding tax years; (2) the plaintiff's claimed excludable gross income corresponding to each tax year; and (3) the plaintiff's total claim requested in each of the five Complaints:

| Plaintiff | Tax Year | League | Claimed Excludable Gross Income | Total Claim |
|---|---|---|---|---|
| Douglas R. Favell, Jr. | 1968 | NHL | $11,421.00 | $24,597.80 |
| No. 525–76 | 1969 | NHL | $12,658.00 | |
| | 1970 | NHL | 12,918.00 | |
| | 1971 | NHL | 18,490.00 | |
| Gilles Marotte | 1968 | NHL | 7,346.00 | $16,185.54 |
| No. 531–76 | 1969 | NHL | 9,200.00 | |
| | 1970 | NHL | 12,400.00 | |
| | 1971 | NHL | 14,500.00 | |
| Frederick E. Speck & | 1968 | NHL | 3,309.00 | $ 3,984.00 |
| Linda L. Speck | 1971 | NHL | 3,361.00 | |
| No. 42–77 | 1972 | NHL (WHA) | 0.00 | |
| Francis W. Speer | 1968 | NHL (AHL) | 7,364.00 | $ 6,571.00 |
| No. 43–77 | 1969 | NHL | 8,555.00 | |
| | 1971 | NHL | 10,163.00 | |
| Garnet E. Bailey | 1968 | NHL | 4,039.00 | $ 8,472.00 |
| No. 122–77 | 1969 | NHL | 7,549.00 | |
| | 1971 | NHL | 8,637.00 | |

## Discussion

The issue before the court is whether, in accordance with Treasury Regulation § 1.861–4(b), Treas.Reg. § 1.861–4(b) (1969), the plaintiff hockey players, who have nonresident alien tax status, should be allowed to exclude from United States taxable income for the tax years in question, that portion of salaries earned for alleged contractual services performed outside the United States during the off-season. The underlying issue before the court, which was articulated somewhat differently by both parties,[12] requires a determination, as a matter of law, as to whether conditioning programs, fitness exercises and similar activities, engaged in by the plaintiffs, during the off-season, outside the United States, should be viewed as contractural conditions, or labor or services required to be performed under the Standard Player's Contracts at issue.[13]

Before addressing the merits of the motion and cross-motion for partial summary judgment, the court must assure itself that the portions of the case presented for review are ripe for disposition by summary judgment. The court must determine, at the outset, whether or not there is a genuine issue as to any material facts which would prevent this court from reaching a decision on the dispositive motions, as filed, which, by the assertion of each party, requires a determination of a pure legal issue. Once the court is satisfied that no genuine issue of material fact is in dispute, it can proceed to decide the cross-motions in order to dispose of all or portions of the action. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.

Cir.1987); *Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1480 (Fed.Cir. 1986).

Simply because the parties have simultaneously filed or cross-moved for partial or full summary judgment, and both parties argue that there is no genuine issue of material fact in dispute, does not establish that a trial is unnecessary, thereby empowering the court to enter judgment on the motions. *Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). Cross-motions are no more than a claim by each party asserting their belief that they are entitled to summary judgment. The assertion of such contradictory claims does not necessarily imply that if one party's claim is rejected the other party's claim must be granted and that no trial is necessary. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). It is always the responsibility of the court, based on the information provided by the parties, to determine whether a motion for summary judgment or partial summary judgment can be granted or whether the case should proceed to trial.

The summary judgment procedure in the United States Claims Court is authorized by Rule 56 of the Rules of the United States Claims Court, RUSCC 56, 28 U.S.C. (Supp. IV 1986), and is a method for promptly disposing of all or parts of an action without a trial, on the condition that there is no genuine issue as to any material

---

**12.** By motion and cross-motion for partial summary judgment, the parties requested the determination of the "income allocation issue" which is common to these five and most of the other pending hockey player refund tax cases. As stated by the plaintiffs, the issue is, "[a]re Plaintiffs entitled to the exclusion on the time basis pursuant to Regulation Section 1.861–4(b) –2 [Treas.Reg. § 1.861–4(b) (1969)] for services performed in Canada as a matter of law because their contracts expressly state the Plaintiffs are compensated for such services."· The defendant stated the issue in its response and cross-motion as "[w]hether the salary received by profession-

al hockey players under standard player's contracts was paid, in part, for labor or services performed during the off-season."

**13.** For purposes of this discussion, the court will assume that any contractual periods not specifically stated in the facts outlined above or in plaintiffs' proposed facts, to which the defendant stipulated for the purposes of deciding these motions, are controlled by the National Hockey League standard player's contractual provisions and requirements.

facts in dispute remaining. The motion can only be granted to resolve a purely legal issue. The Rule 56 procedure provides the means by which a party, or both parties, may penetrate the allegations contained in the pleadings and obtain a legal conclusion from the court by introducing outside evidence showing that there are no fact issues which would necessitate a trial. *United States v. General Motors Corp.*, 518 F.2d 420, 440–41 (D.C.Cir.1975). As stated in RUSCC 56, the court may consider any outside evidence which would be admissible at trial. The use of such evidence, however, is limited to identifying the existence or nonexistence of disputed facts. RUSCC 56 does not empower the court to try issues of fact, but only allows the court to determine whether there are factual issues to be tried, based on the material facts submitted by the plaintiffs in the case and stipulated to by the defendant, to dispose of the disputed legal issue.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court indicated the standard which courts must apply when considering whether a trial would be proper in lieu of disposing of an action through a motion for summary judgment. In the midst of an in-depth analysis of Rule 56 of the Federal Rules of Civil Procedure, which is, in material part, the same as RUSCC 56, the Supreme Court stated that Rule 56, by its very terms, requires the trial court to determine that there is no genuine issue of material fact in dispute which would prevent the summary disposition of a case without a trial. *Id.* at .247–48, 106 S.Ct. at 2509. First, the *Anderson* Court considered the materiality requirement and then, the "genuine issue" provision of Rule 56.

■ Regarding materiality, the Supreme Court said that

> the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for catergorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Id.* at 248, 106 S.Ct. at 2510 (citations omitted). Additionally, any inferences to be drawn from the underlying facts should be viewed in a light most favorable to the party who is opposing the motion for summary judgment. *Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988). *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 298 (1988). As guidance to lower courts when considering the question of whether, in a case pending disposition by motion for summary judgment, there exists any "genuine issue" of material fact, the ·Court said that the judge's "function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510. The *Anderson* decision indicates that a dispute as to a material issue is only "genuine" under Rule 56 when "the evidence is such that a reasonable jury [or judge] could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. In sum, the Supreme Court stated the general standard for review as: "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. The Court also said that "the determination of whether a given factual dispute requires submission to a [fact finder] must be guided by the substantive evidentiary standards

that apply [in each] case." [14] *Id.* at 255, 106 S.Ct. at 2514. Once a court finds that a particular case is in the proper posture for a ruling on a motion for summary judgment as a matter of law, the Supreme Court said that "[t]here is no requirement that the trial judge make findings of fact." *Id.* at 250, 106 S.Ct. at 2511 (footnote omitted).

■ In this case, to determine materiality of the facts as submitted by the plaintiffs, including the numerous documents which describe many matters not involving the five representative plaintiffs, this court looked to two bodies of applicable substantive law: federal income tax and general contract law. With respect to federal income tax law, the present tax issue involves a determination of the amount of income that plaintiffs received for the services they performed in the United States. As nonresident aliens who rendered services both within and outside the United States, plaintiffs are subject to United States federal income tax only on that portion of their income properly attributable to the conduct of a trade or business (including the performance of personal services) within the Unites States. 26 U.S.C. § 861(a) (1954). *See also* 26 U.S.C. §§ 864, 871 to 877 (1954). To determine the apportioned amount of each plaintiff's total gross income which is properly subject to inclusion as income earned within the United States, the parties agree, that because the Standard Player's Contracts at issue do not specifically assign a dollar figure to each contractual obligation, Treasury Regulation § 1.861–4(b) applies in this case. The regulation provides, in pertinent part, that where,

> no accurate allocation or segregation of compensation for labor or personal services performed in the United States can be made, or when such labor or service is performed partly within and partly without the United States, the amount to be included in the gross income shall be determined by an apportionment on the time basis; that is, there shall be included in the gross income an amount which bears the same relation to the total compensation as the number of days of performance of the labor or services within the United States bears to the total number of days of performance of labor or services for which the payment is made.

Treas.Reg. § 1.861–4(b)(2) (1969).

The application of this regulation in the instant case has raised an issue which has become known as the "income allocation issue." For ease of understanding, allocation of income in accordance with the regulation can be reduced to the following "time basis" formula:

$$\frac{\text{Number of days of performance of services within the United States}}{\text{Total number of days of performance of services for which hockey player is compensated}} \times \begin{array}{c}\text{Total}\\\text{contract}\\\text{compensation}\end{array} = \begin{array}{c}\text{Amount included}\\\text{in United States}\\\text{taxable income.}\end{array}$$

The parties agree that Treasury Regulation § 1.861–4(b) and the above formula control in this case because the Standard Player's Contracts at issue provide no specific allocation of income between payment for services performed within and without the United States. Furthermore, there is no issue as to the number of days on which plaintiffs performed services within the

---

**14.** In a tax refund action, there is a presumption that the assessment of taxes owed, as determined by the Commissioner of Internal Revenue, is correct and that the plaintiff must present substantial evidence that the Commissioner's determination is incorrect. *KFOX, Inc. v. United States,* 510 F.2d 1365, 1369, 206 Ct.Cl. 143, 151–52 (1975).

United States,[15] since the defendant has acknowledged that whatever time the plaintiffs spent in the United States from the beginning of training camp to the end of the season, including play-off and Cup games, may be considered as work in the United States.[16] In contrast, all days spent during the same period performing services under the Standard Player's Contract outside the United States, in Canada, may be considered services performed outside the United States. The controversy at issue in the pending motions, therefore, centers on the correct number to be used as the regulatory formula's denominator: the total number of days of performance of labor or services for which plaintiffs received their salaries under the relevant Standard Player's Contracts.

In this regard, plaintiffs claim that the compensation they were paid, pursuant to the Standard Player's Player's Contracts at issue, covered services performed throughout the entire 12–month year (including the off-season), and that the proper denominator is thus 365 days. This argument is predicated on the plaintiffs' notion that the salary specified in each player's contract was paid to fulfill each and every clause in the agreement. Plaintiffs reason that since they were contractually bound by the Standard Player's Contract to do various things during the off-season, *e.g.*, to achieve a level of physical fitness sufficient to report to training camp in "good physical condition," to participate in promotional activities, and to refrain from engaging in certain contact sports and improper conduct, they were effectively "on the job" and providing contractual services every day of the year. The defendant, however, submits that to the extent the plaintiffs, or any others performing under Standard Player's Contracts, assumed obligations or responsibilities which extended into the off-

season, such duties were conditions of employment for which no compensation was to be paid.

Since the dispute between the parties is based on the denominator in the income allocation formula and the denominator is drawn from an interpretation of the Standard Player's Contracts at issue, the court is required to consider contract law in its determination of the propriety of summary judgment in this action.

■ Contract interpretation, generally, is a matter of law and thus is amenable to decision on summary judgment. *Government Sys. Advisors, Inc., v. United States,* 847 F.2d 811, 812 n. 1 (Fed.Cir.1988). In a contract dispute, however, summary judgment will not be granted, if issues which involve an inquiry into the state of mind of either of the parties at the time the contract is entered are at issue. An inquiry into the contracting parties' intentions, which is a contractual interpretation issue, may require factual findings and a trial by the court. *United States v. Sacramento Mun. Util. Dist.,* 652 F.2d 1341, 1343–45 (9th Cir.1981); *Charbonnages de France v. Smith,* 597 F.2d 406, 414–15 (4th Cir.1979); *Peoples Outfitting Co. v. General Elec. Credit Corp.,* 549 F.2d 42, 45 (7th Cir. 1977); *S.J. Groves & Sons Co. v. Ohio Turnpike Comm'n,* 315 F.2d 235, 237–38 (6th Cir.), *cert. denied,* 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963).

■ The rule, however, is well settled that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein. *Gambling v. Commissioner,* 682 F.2d 296, 300 (2d Cir.1982) (quoting *Nichols v. Nichols,* 306 N.Y. 490, 496, 119 N.E.2d 351, 353 (1954)). The preliminary question of whether, based on the words of the contract, a contract ambiguity exists which

---

**15.** The numerator of the time basis formula.

**16.** Quoting the Cross–Motion of the United States for Partial Summary Judgment and Brief in Support Thereof and in Opposition to Plaintiffs' Motion for Partial Summary Judgment: [T]he [defendant] had originally taken the position that no compensation was paid to the [plaintiffs] for their training camp activities,

and that a separate compensation plan existed for the play-offs and Cup play. For purposes of our motion, however, we are now prepared to concede that the salary called for in the [Standard Player's Contracts] cover the entire hockey season, including training camp and play-off (or Cup) competition.

could result in a finding that the views of the parties when they entered into the contract could differ, is a question of law, which may be resolved by the court, in summary proceedings. *United States v. Sacramento Mun. Util. Dist.*, 652 F.2d at 1343–45; *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *John C. Grimberg v. United States*, 7 Cl.Ct. 452, *aff'd*, 785 F.2d 325 (Fed.Cir.1985).

The court concludes that all of the Standard Player's Contracts at issue are clear and unambiguous. As stated by the Court of Claims: "[w]here a written contract is not ambiguous, the wording of the contract controls its meaning and resort cannot be had to extraneous circumstances or subjective interpretations to determine such meaning." *Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725, 192 Ct.Cl. 310, 315 (1970) (citing *Duhame v. United States*, 119 F.Supp. 192, 195, 127 Ct.Cl. 679, 683 (1954)). This court, therefore, should not attempt to interpret the words of those contracts in order to seek a deeper meaning as expressions of the intent of the parties to the contracts, because there is no contractual ambiguity which would require such an inquiry.

Since the parties have stipulated to all facts which the court considers material to the income allocation issue under both the relevant tax and contract law, it is not necessary to explore further the "genuine issue" portion of the Rule 56 test to determine the ripeness of an action for summary disposition, upon motion of either party, set out in the *Anderson* decision.[17] This court, therefore, has before it a pure issue of law and can focus on deciding the contractual issue as a matter of law. Even the parties agree, and state in their briefs, that no fact question remains to be decided. For example, in their Motion for Partial Summary Judgment And Memorandum in Support

Thereof, plaintiffs state that "the contractual language is clear and precise, [and] this court should go no further." The court agrees with the parties in this regard and does not consider it necessary to go beyond the contractual language at issue into an examination of the intent of the parties to the National Hockey League Standard Player's Contracts and the World Hockey Association Uniform Player's Contract at issue.

Each of the five test-case plaintiffs contend, nonetheless, that under the Standard Player's Contracts at issue, it was intended that they be compensated for activities performed during the off-season to fulfill their obligation to report to training camp in good physical condition. The off-season activities undertaken by each of the plaintiffs varied. Plaintiffs state that although not specifically described in the contracts, off-season conditioning programs were determined by each plaintiff individually or, these programs were individually designed and prescribed by the player's hockey club. According to the plaintiffs, conditioning programs traditionally include participation in sports activities, such as basketball, tennis, golf, racketball, and hockey with the express consent of the club, and exercise programs, consisting of calisthenics, sit-ups, push-ups, and jogging. In addition, sometimes complete teams were sent to special fitness conditioning centers or power skating camps. The plaintiffs claim that such off-season activities were contemplated to be compensated contractual services when the parties to the Standard Player's Contracts at issue executed the respective agreements. Plaintiffs, consequently, claim that Treasury Regulation § 1.861–4(b) entitles them, as non resident aliens, to apportion their salaries on an annual basis and thus exclude from United States taxable income, income earned during the time activities were performed out-

17. Following the Supreme Court's discussion addressing the materiality requirement of Rule 56, the Court focused on what it considered the more important inquiry of the lower courts when ruling on a motion for summary judgment: "summary judgment will not lie if the dispute about a material fact in 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. at 248, 106 S.Ct. at 2510.

side the United States, including any services performed during the off-season.

The plaintiffs' brief directs this court's attention to two main areas of evidentiary support as to why they believe they should prevail in this action: off-season mandatory conditioning programs and off-season hockey club supervision or control over the hockey players. The plaintiffs believe that the absence of sufficient evidence on these two points in the records before the United States Courts of Appeals for the Second and Fourth Circuits was the reason that those courts of appeals did not hold in favor of plaintiffs Stemkowski and Hanna on the income allocation issue. *Hanna v. Commissioner*, 763 F.2d 171 (4th Cir.1985); *Stemkowski v. Commissioner*, 690 F.2d 40 (2d Cir.1982).

The defendant, however, contends that the National Hockey League Standard Player's Contract clause, paragraph 2(a), and the World Hockey Association Uniform Player's Contract, paragraph 2.2, which require hockey players to arrive at training camp in "good physical condition," should be read as a condition of each contract, not as a promise to perform services for the benefit of the hockey club during the off-season. The defendant argues, therefore, that both the National Hockey League Standard Player's Contract and the World Hockey Association Uniform Player's Contract contemplated that the contractual service term would not include the off-season period, during which time these plaintiffs lived outside the United States, and that the player's contractual salary was not in-tended to pay for off-season preparation for contract performance.

Since neither of the Standard Player's Contracts specifically segregate the player's compensation for individual services, the parties agree that the contract salary should be allocated using a time basis, as prescribed in Treasury Regulation § 1.861–4(b). The regulation provides that the amount to be included in gross taxable United States income should be that "amount which bears the same relation to the total compensation as the number of days of performance of the labor or services within the United States bears to the total number of days of performance of labor or services for which the payment is made." Treas.Reg. § 1.861–4(b) (1969).

The dispute between the parties focuses on the total number of days for which a player should receive compensation under the terms of the National Hockey League Standard Player's Contract and World Hockey Association Uniform Player's Contract. In other words, the parties disagree as to the denominator of the time basis formula. The plaintiffs contend that the Standard Player's Contracts contemplate compensating the player for off-season services, and that, therefore, the off-season period should be included in the time basis formula.

The defendant, however, contends that the standard player's contracts at issue do not contemplate compensating the hockey player for off-season activities and that the proper income allocation formula should not include the off-season period.[18]  Be-

---

18. For clarification, the following example is a completely hypothetical application of the Time Basis Formula as the plaintiffs and defendant would have this court apply it:

Total number of days in regular season = 180
Total number of days in United States during regular season = 160
Total number of training camp days = 30
Total number of training camp days spent in Canada = 30

Total number of days during play-off season = 30
Total number of days in United States during the play-off season = 25
Total number of off-season days spent in Canada = 125
Total contract compensation = $10,000.

*Plaintiffs:*

$$\frac{\text{Number of regular season, training camp, play-off and off-season days spent in the United States}}{\text{One year contract term}} \times \begin{array}{l} \text{Total contract} \\ \text{compensation} \end{array} = \begin{array}{l} \text{Gross taxable} \\ \text{United States} \\ \text{income} \end{array}$$

$$(160 + 0 + 25 + 0) \: / \: 365 \times \$10,000 = \$5,068.49.$$

cause the parties disagree on the components to be included in determining the proper income allocation formula, the issue before this court is whether or not the Standard Player's Contracts at issue compensate the hockey player for off-season activities, which would in turn allow the off-season period to be included in the time basis or income allocation formula and thereby reduce the hockey player's gross taxable United States income.

In this action, the plaintiffs have submitted seven, lengthy volumes of documents, such as trial transcripts and exhibits from other proceedings in another court, copies of contracts, copies of training programs, letters, pamphlets, minutes of meetings between League and player representatives, a report of a private investigator on a non-test-case plaintiff, and numerous affidavits.[19]

Much of the material submitted is unrelated to the five test-case plaintiffs and is unrelated to the tax years at issue. This court has, nonetheless, carefully reviewed all the material submitted by both parties to determine its relevance and impact on the issues it must decide. As discussed above, for the purposes of deciding the instant partial summary judgment motions, the defendant has agreed to accept plaintiffs version of the facts, rather than to individually examine and contest the validity of any or all of the documents submitted. In fact, defendant has chosen to rely on the words of the contracts which give rise to the tax liabilities at issue in the cases. Defendant is correct that despite the excessive record before the court in a matter ready for partial summary disposi-

tion, the key document remains the relevant contracts, signed by the hockey players.

For the tax years at issue, the test-case plaintiffs, Douglas Favell, Gilles Marotte and Garnet Bailey, each signed the National Hockey League Standard Player's Contracts. One plaintiff, Frances Speer, signed National Hockey League Contracts for all but one relevant year in which he signed an American Hockey League contract.[20] Only one test-case plaintiff, Frederick Speck, signed a World Hockey Association Uniform Player's Contract in October of 1972. For all other relevant years, Mr. Speck also signed National Hockey League Standard Player's Contracts. As is more fully discussed below, only one relevant provision of the World Hockey League Uniform Player's Contract is differently worded from the National Hockey League contracts.

General principles of contract interpretation direct that when interpreting a promise or agreement, or a part thereof, certain preferences are generally applicable including the notion that an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. Restatement (Second) of Contracts § 203(a) (1981); see also *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir.1985). Furthermore, with respect to standardized agreements, such as those at issue in this case, the Restatement (Second) of Contracts states that

> where a party to an agreement signs or
> otherwise manifests assent to a writing

*Defendant:*

| Number of regular season, training camp, and play-off days spent in the United States | | Gross taxable |
|---|---|---|
| Compensated contract term (One year—off season period) | × Total contract = compensation | United States income |

$$(160 + 0 + 25) \,/\, 240 \times \$10{,}000 = \$7{,}708.30.$$

**19.** Despite the numbers of documents submitted by the plaintiffs which describe the "glory of the sport of hockey and the grandeur of its superstars [and their off-season activities], the basic factors here are not the sheer exhilaration from observing the speeding puck, but rather the desire to maximize the available buck." *Philadel-*phia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462, 466 (E.D.Pa. 1972).

**20.** *See supra* note 10.

and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the terms included in the writing.

Restatement (Second) of Contracts § 211(a) (1981). As an integrated agreement, the parties to the Standard Player's Contracts and Uniform Player's Contracts at issue agree that the signed writing constitutes a final expression of terms included therein. Restatement (Second) of Contracts § 209 (1981). Since the process of interpreting the contracts at issue does not depend on the "credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence," *Id.* § 212(b), the court's interpretation of the Standard Player's Contracts and the Uniform Player's Contract requires the determination of a question of law which is ripe for summary disposition.

"Under recognized rules of contract interpretation, words are to be given their plain and ordinary meaning." *Tester Corp. v. United States,* 1 Cl.Ct. 370, 373 (1982) (quoting *Thanet Corp. v. United States,* 591 F.2d 629, 633, 219 Ct.Cl. 75, 82 (1979) and citing *Timber Access Industries Co. v. United States,* 553 F.2d 1250, 213 Ct.Cl. 648 (1977); *Whelan v. United States,* 529 F.2d 1000, 208 Ct.Cl. 688 (1976)). Moreover, the "provisions of a contract must be construed so as to effectuate the spirit and purpose the the contract. The agreement must be considered as a whole, and interpreted so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States,* 591 F.2d 629, 633, 219 Ct.Cl. 75, 82 (1979); *see also Fortec v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (citation omitted).

The National Hockey League Standard Player's Contracts and the World Hockey Association Uniform Player's Contract at issue were entered into for 12–month periods for which the hockey players were to be paid specified salaries.[21] The relevant contracts also provide that if the players are not in good physical condition at the commencement of the season so as to render them unfit to play hockey, the club has the right to suspend them without pay. Additionally, the contracts provide that if the player was not in the employ of the club for the entire regular season, the contract salary is to be prorated based upon the ratio of the number of days he was so employed to the total number of days in the league championship schedule. There are no specific provisions defining the services to be performed at particular times during the off-season; nor are there any specific allocations of the total salary compensation attributable to any off-season service.

The contracts at issue provide for the following general duties and obligations of the hockey player (which apply to the off-season of play as well as to the remainder of the year): to give his best services and loyalty to the club; to cooperate with the club and to participate in any and all promotional activities of the club and the league; to conduct himself off the rink according to the highest standards of honesty, morality, fairplay, and sportmanship and to refrain from conduct detrimental to the best interests of the club, the league, or hockey, generally; to comply with rules which the club may establish for conduct and conditioning; to submit to a medical examination if he is disabled or unable to perform his services; to refrain from participating in certain other specified sports without consent of the club; to consent to being photographed or televised for the exclusive use of the club; to refrain from making public radio or television appearances, having his picture made, writing or

---

21. Although the World Hockey Association Uniform Player's Contract does not explicitly state that the contract term is 12 months, plaintiff's argue that this contract is even more specific than the National Hockey League contract in that the Uniform Player's Contract explicitly states that the player is obligated "to give his best services, best performance and loyalty to the Club both in and out of season." Plaintiffs contend that this language is more precise support of the argument that the contracts at issue require off-season activities to be performed by the player than the general language of the National Hockey League contract which states that the contract term is one year.

sponsoring newspaper or magazine articles or commercial products without the written consent of the club; and to refrain from tampering with any negotiations for a player's contract.

Paragraph 19 of the National Hockey League Standard Player's Contract outlines the contractually compensated for services which the professional hockey player agrees to perform when contracting with the hockey team as follows:

The Player agrees that the Club's right to renew this contract as provided in Section 17 and the promise of the Player to play hockey only with the Club, or such other club as provided in Section 2 and Section 11, and the Club's right to take pictures of and to televise the Player as provided in Section 8 have all been taken into consideration in determining the salary payable to the Player under Section 1 hereof.

It is clear that the focus of this paragraph is the player's obligation to play hockey and to enhance his image as a hockey player.

The plaintiffs contend that the player's contracts, both the National Hockey League and World Hockey Association, require the performance of off-season conditioning programs and that such off-season activities should be considered compensated contractual obligations. Plaintiffs argue that the need to maintain their level of physical conditioning during the off-season is a requirement to perform services during the off-season. Plaintiffs also relied on the World Hockey Association Uniform Player's Contract, which was supposedly modeled after the National Hockey League contract, and specifically, to paragraph 2.5 of that contract in which the player agrees "[t]o give his best services, best performance and loyalty to the club both in and out of season."

The defendant, however, argues that the contractual references to the player's requirement to maintain a level of physical condition is a contractual condition, not a promise to perform services. As such, defendant contends that the player does not receive his salary, pursuant to paragraph 19 of the contract, for the performance of any off-season exercise program which, when performed by the player, merely enables the player to maintain a desired minimum level of physical condition adequate to compete in the professional sport of hockey.

Contract promises and conditions are both means by which the parties to a contract bring about certain desired actions of another party. 3 A. Corbin, Contracts § 633 (1950). A contractual condition is to be distinguished from a promise, obligation, or covenant in that a condition creates no right or duty in and of itself, but merely acts as a limiting or modifying contract provision. "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981). If a condition does not occur, whether through breach or other cause, the party fails to meet the condition, and acquires no right to enforce the promise. A contractual promise or obligation, on the other hand, raises a duty to perform a service and its breach subjects the promisor to liability and damages, but does not necessarily excuse performance by the other contracting party. *United States v. Schaeffer*, 319 F.2d 907 (9th Cir.1963), *cert. denied*, 376 U.S. 943, 84 S.Ct. 798, 11 L.Ed. 2d 767 (1964).

Under paragraph 2(a), of the National Hockey League Standard Player's Contract, the player promises to report to training camp and the club places the added condition on the player that he must report in "good condition." *See supra* p. 705. Under the terms of the paragraph 2(a), a failure by a player "to report" to training camp would result in a material breach of the contract by the player. However, a failure to fulfill the condition of fitness would be the non-occurrence of an event, which would give the hockey club the option to excuse the non-occurrence, terminate the contract pursuant to paragraph 13(a), *see supra* p. 708, fine and/or suspend the player, as provided for in paragraph 6 of the contract, or simply not ful-

fill the club's obligation to renew the contract as provided for in paragraph 8(a) of the National Hockey League Standard Player's Contract. The decision not to renew the contract would only be available in a situation where a new contract has not yet been signed. If the new contract had been signed prior to the time by which the fitness condition is due to have occurred, the Club can, at its own discretion, exercise an option not to fulfill a contractual obligation to compensate the player as provided for in paragraphs 4 and 5 of the Standard Player's Contract.

In fact, in the materials submitted by the plaintiffs, instances in which certain hockey players, were demoted or suspended for a failure to meet the fitness requirements are documented. Demotion or suspension is a manner in which the hockey club either excuses the non-occurrence of a contractually express or implied condition for an unspecified period of time until the club's management, at its own discretion, determines the event has occurred and re-evaluates the player or lifts the suspension, or terminates the contract and its own duties pursuant to or paragraph 13(a). *See supra* p. 708.

"[A]lthough punctuation [of contractual clauses] is often used as an aid in contract interpretation," *Royal Ins. Co. v. Ideal Mut. Ins. Co.*, 649 F.Supp. 130, 137 (E.D.Pa 1986), in the instant action, the court's focus on the punctuation of a single paragraph of the National Hockey League Standard Player's Contract merely supports the conclusions also reached following an analysis of the entire contract. In accordance with paragraph 2(a) of the National Hockey League Standard Player's Contract, the hockey player agrees "to report to the Club training camp at the time and place fixed by the Club, in good physical condition." A plain reading of this contract clause and specifically focusing on the punctuation of the clause, could only lead a reasonable person to conclude that the words "in good physical condition" modify the remainder of the clause, "to report to the Club training camp at the time and place fixed by the Club," and describe the condition placed upon the hockey player upon arrival at the training camp. The words "in good physical condition" are set off from the remainder of the paragraph by use of a comma before the word "in," which would indicate that when reading paragraph 2(a), as a whole, reference to the latter clause, "in good physical condition," is used as a contractual condition and not as a specific obligation upon the hockey player to perform a particular service to arrive at training camp "in good physical condition." The contractual obligation placed upon the hockey player by this paragraph is that the player must "report" to the training camp at the fixed time arranged by the hockey club. Contrary to the plaintiffs' contentions, this paragraph, on its face, obligates the player to "report" to training camp at the prearranged time, having fulfilled the fitness condition, "in good physical condition." The punctuation of this one paragraph of the Standard Player's Contract, however, is not being allowed to "control a meaning which is evident from a consideration of the [contract] as a whole." [22] *Id.*

---

**22.** The World Hockey Association contractual provision which is the counterpart to paragraph 2(a) of the National Hockey League Standard Player's Contract, is Uniform Player's Contract paragraph 2.2. This paragraph 2.2 obligates the player "to report, in good physical condition and training at the time and place fixed by the Club, and to render full time services required of a skilled hockey player." *See supra* p. 705. The punctuation in this provision, with the words "in good physical condition and training at the time and place fixed by the club," set off by a comma modify the words "to report," further supports the conclusion that "to report" is a promise and "in good physical condition" is a contractual condition.

In paragraph 2.2 of the Uniform Player's Contract of the World Hockey Association, "to report" and "to render" are contractual promises. The hockey player is promising to report to training camp and render the services of a hockey player, which primarily include, but are not limited to, playing hockey. The action required on the part of the player is to report to training camp. The hockey club's return promises would not have to be performed if the player is not in "good physical condition" at the time he is expected to report to training camp because the condition of fitness has not occurred. This translates into exactly what the Restatement (Second) of Contracts has defined as a contrac-

The conclusion that paragraph 2(a) of the National Hockey League Standard Player's Contract describes a condition of fitness, attached to a contractual promise "to report" to training camp also finds support in other relevant contractual provisions. In reference to certain per diem compensation of the player for training camp services and the promise to report to practices and scheduled exhibition games, paragraph 3 of the National Hockey League Standard Player's Contract speaks of the player's need to be fit and in the proper condition in order to be able to properly perform his duties. *See supra* p. 706. Moreover, because the player must report in good physical condition, as stated in paragraph 2(a) of the National Hockey League Standard Player's Contract, in order to properly perform his duties, fitness as referred to in paragraph 3, should be considered "good physical condition." Therefore, "in good physical condition" would be considered a contractual condition of employment.

Contract paragraph 4 of the National Hockey League Standard Player's Contract further defines paragraph 2(a). *See supra* p. 706. Paragraph 4 gives the Club the prerogative to prescribe the player's conditioning plan and states that such rules (conditions) "governing the conduct and conditioning of the Player ... shall form part of th[e] contract as fully as if" specifically included as part of the original document. A failure to comply with the added contractual conditions could result in a fine and/or suspension. Such a penalty, if imposed, would constitute the hockey club's "compensation" for excusing the failure or non-occurrence of a contractual condition which had to occur before the club's return performance would be required. Therefore, a player could be suspended, fined or even terminated, pursuant to paragraph 13(a), *see supra* p. 708, if he did not follow or comply with his hockey club's rules of conditioning, issued and added to the contract, pursuant to paragraph 4.

Paragraph 4 of the National Hockey League Standard Player's Contract states that the Club may impose a fine and/or

suspension for a failure to comply with rules of conditioning, because such a failure would impair "the thorough and faithful discharge of the duties incumbent upon the player" to perform. *See supra* p. 706. Clearly, the only duties to which this paragraph can be referring are the player's obligations to play hockey and promote the sport of hockey, pursuant to paragraph 2 of the Standard Player's Contract, to which a player's good physical fitness is a condition precedent.

The contract itself distinguishes between that which is a condition or rule and that which is a promise or obligation. All provisions which refer to the player's required physical condition use terminology which describe the requirement as a condition or rule of conditioning or training not a promise, obligation, or duty. These provisions do not specifically include a player's positive obligation to take action. Paragraph 4 does not require that the player act, but rather, the player is warned of the consequences of failure to comply with the rules or conditions of employment. The player is not obligated to perform an act, however, a failure to obey a rule could result in a fine and/or suspension because a condition of the employment contract has not occurred.

Still further support for the conclusion that the words "in good physical condition" describe a contractual condition can be found in paragraph 5 of the National Hockey League Standard Player's Contract. *See supra* pp. 706–07. Paragraph 5 refers to "good physical condition" as a condition of the hockey player's fitness to play professional hockey. According to paragraph 5, "[i]f the Player, in the sole judgment of the Club's physician, is disabled or is not in good physical condition at the commencement of the season ... so as to render him unfit to play skilled hockey," then the Club may suspend and not compensate the "Player for such period of disability or unfitness[.]" Because this contractual provision, which calls for discretionary suspension without compensation when the hockey player is not in the proper physical condition at the commencement of

tual condition. Restatement (Second) of Con-      tracts § 224 (1979).

the season, uses the same terminology as used in paragraph 2(a), to refer to the player's fitness to play skilled hockey, the words "in good physical condition" seem to be used throughout the contract to refer to a contractual condition which requires that the player be fit in order to perform the contractual promise to play professional hockey.

Paragraph 13 of the National Hockey League Standard Player's Contract describes the Club's right to terminate the contract. *See supra* p. 708. Paragraph 13 separates the right to terminate for the failure, refusal, or negligence of a player which resulted in the non-occurrence of a contractual condition, the failure to render contractually agreed services and the failure to exhibit sufficient skill into three subparagraphs. Specifically, paragraph 13(a) permits the hockey club to terminate the contract if the player "fail[s], refuse[s] or neglect[s] to obey the Club's rules governing training and conduct of players." This language does not require the performance of a rule or condition, but rather, it merely gives the Club the power to sanction the player for the noncompliance or nonobeyance of the conditions referred to in paragraph 4 of the contract.

Not only can the club terminate a player's contract for the failure to comply with the club's rules, but the club may also terminate the contract for the failure to perform contractual services pursuant to paragraph 13(b). A failure to render contractual services would include a failure to report to training camp at the appointed time, to play hockey, or to report to practice during the playing seasons. It would be incorrect to say that a non-occurrence of the contractual condition of fitness is a failure to perform a service. Even in the termination clause, the contract, on its face, distinguishes between a condition and a rule.[23]

Paragraph 13(b) states that the failure to render a service is a "material breach" of the contract. *See supra* p. 708. Once again, this is another way in which the contract distinguishes between the result of a failure to play hockey or report to training camp and the consequences of a failure on the part of the player to maintain his superior skill.

The failure to report to training camp is a failure to render services and a material breach of the contract. In the instant case, the hockey club has made the requirement that the hockey player arrive at training camp "in good physical condition," a contractual condition so that the player will have to see that the event occurs in order to have a right to either the agreed compensation or the right to the renewal of the contract if the contract term expires.

■■■ The court is unpersuaded by plaintiffs' position that off-season conditioning activities are to be compensated under the contract, despite the mountains of material delivered to the court. Given the words of the standard form contracts themselves, a reasonable reader must conclude that the plaintiffs were being employed, and more important, compensated for their performance as professional hockey players.

It is not surprising, perhaps even to be expected, that hockey players are supposed to maintain a level of physical ability, under the Standard Player's Contracts at issue, in order to ably perform as professionals in their field. The court notes that professional athletes, like members of all professions, are expected to maintain a minimum level of ability to perform, or else risk losing their positions. In common parlance, maintaining an ability to properly perform a professional obligation is not generally compensated separately, but is assumed a condition for retaining employ-

---

**23.** Non-compliance with a condition of the contract, which in this case is the same as the non-occurrence of an event, furnishes the party to the contract, who has conditioned his own performance on the occurrence of this event, the choice of whether to excuse the non-occurrence or not perform a return contractual obligation. In this case, the parties to the Standard Player's Contracts at issue are specifically agreeing that if the player does not report to training camp in good physical condition, the hockey club can terminate the contract. This is exactly the same as the hockey club not having to perform on its own promise to renew the contract as provided for in paragraph 17. *See supra* pp. 708–09.

ment. The words of the contracts at issue here do not suggest otherwise. For example, a college professor must be aware of all new developments in his or her field of expertise. A lawyer is required to keep abreast of new developments in the law, and a doctor must keep advised of rapidly changing technology and pharmacology to maintain the requisite level of competence necessary to practice medicine. In the case of the professional hockey player plaintiffs, they are being required by their profession and the contracts they signed to maintain the required level of skill and physical fitness to play hockey, or else they risk demotion, suspension, or loss of employment. Such a requirement is a condition of the professional's continued employment and seemingly not unusual for professionals in various disciplines which require continuous competence.

This court finds itself in agreement with the United States Court of Appeals for the Second Circuit, that fitness is a condition of the hockey player's employment. *Stemkowski v. Commissioner of Internal Revenue*, 690 F.2d at 46. In *Stemkowski v. Commissioner*, Judge Oakes, writing for the Court of Appeals for the Second Circuit, in interpreting the National Hockey League Standard Player's Contract, held that the contract does not compensate the hockey player for off-season activities. The court of appeals held that the Standard Player's Contract compensates the hockey player for the time period which includes the regular season championship games, the play-off and cup games, as well as the training camp exercises. However, "[t]he off-season is not covered by the contract." *Id.* The court of appeals added that because claimed off-season activities reasonably relate to the contract compensated obligation, playing professional hockey, for expense purposes, reasonably substantiated expenses which relate to these off-season activities are deductible from United States taxable income. *Id.* In the context of the present issue submitted for disposition by motions for partial summary judgment, it is this court's determination that the only proper construction of the Standard Player's Contracts and the Uniform

Player's Contract is one which is consistent with the Second Circuit's interpretation that the off-season is not covered by the contract. This court agrees with the Tax Court that "[m]aintaining a condition of employment ... does not per se ... mandate a holding that every activity in which the employee engages to achieve that condition constitutes performance of services." *Stemkowski v. Commissioner*, 76 T.C. at 294.

This trial court, is not in the same position as the Tax Court in *Stemkowski v. Commissioner*, 76 T.C. 252 (1981), which was required to decide many questions of fact with respect to the evidence presented by the plaintiffs during the trial. Rather, this court has been requested, by both parties, to address a legal question regarding the interpretation of the Standard Player's Contract and the Uniform Player's Contract and the determination of whether the contract contemplates compensating the plaintiffs for the claimed off-season activities. Moreover, given defendant's agreement to accept plaintiff's version of the facts for the purpose of deciding the motions for partial summary judgment, no factual issues are presented at this time. The Second Circuit's reference to an absence of evidence following its classification of the term "fitness," was not a direction to the plaintiffs' counsel to file with this court voluminous documents to try to prove fitness was a required service under the contract. Fitness is a condition of the professional's contract. This court believes that the Second Circuit was indicating that there was no evidence that the players were compensated and required by their individual contracts, to perform any conditioning or exercise programs. Therefore, the contract itself merely outlines that fitness is a condition of the hockey player's profession and he is not being compensated for maintaining the required physical ability.

The contract does not specifically require the performance of off-season training programs, the contract merely reminds the player that his fitness is a condition of his continuing employment. In fact, the volumes of material submitted to this court by

**726**

the plaintiffs merely reinforce the importance of the condition of employment, that the player must report, to perform his obligation to play professional hockey, in good physical shape. Although the parties agree that the players performed off-season activities which might have been beneficial to the club and player, they also agree that the club exerted some guidance over the player during the off-season. Nowhere in the contracts, however, are specific off-season obligations assigned to the players. *See Stemkowski v. Commissioner*, 690 F.2d at 46.

This court is also unpersuaded by the plaintiffs argument that the contract salaries are allocable to the entire 12-month period of the contracts because of all the general covenants to which plaintiffs obligated themselves during the entire period of the contracts in question. This issue was also correctly addressed by the Tax Court in its discussion concerning the negative covenants of the Standard Player's Contract. *Stemkowski v. Commissioner*, 76 T.C. at 296–98. This court agrees with the conclusion that such "negative covenants in the employment contracts were designed to further the primary purpose of the contract, *i.e.*, playing hockey." *Id.* at 298. Likewise, after concluding that the hockey player's obligation to arrive at training camp in good physical condition was a contractual condition, the Second Circuit, in Stemkowski, added that:

[t]here was no evidence that Stemkowski was required to follow any mandatory conditioning program or was under any club supervision during the off-season. He was required to observe, if anything, only general obligations, applicable as well throughout the year, to conduct himself with loyalty to the club and the league and to participate only in approved promotional activities.

*Stemkowski v. Commissioner*, 690 F.2d at 46. It is this court's determination that, with respect to each of the test-case plaintiffs, no universally mandatory, off-season conditioning programs were required by the contract and that thus, on its face, the contract does not obligate the performance

of the claimed off-season conditioning programs as asserted by the plaintiffs. The contracts at issue do not contemplate the off-season as a contractually compensated period.

As already discussed, the requirement to arrive at training camp in good physical condition is in the nature of a contractual condition and not an obligation or promise on the part of the player. Even in cases where the player is compensated in semi-monthly payments throughout the year or only during the regular season, the player is not obligated under the contract to perform a specific service during the off-season and the words "in and out of season" in paragraph 2.5 of the World Hockey Association Uniform Player's Contract, *see supra* p. 711, do not alter this result. It seems logical, and the language of the contracts at issue support the conclusion, that the hockey clubs should want to make sure that the players are abiding by contractual conditions. Additionally, the words, "in and out of season," allow the hockey clubs to enforce their contract rights at any time during the period of the contract.

A reading of the entire National Hockey League Standard Player's Contract as well as of the World Hockey Association Uniform Player's Contract, both of which describe the obligations placed upon the hockey player and the hockey club during the term of the respective contracts, support the conclusions of this court. The court notes too that the established rule that *expressio unius est exclusio alterius* is also applicable in this case. *J.W. Bateson Co. v. United States*, 450 F.2d 896, 902, 196 Ct.Cl. 531, 542 (1971). This maxim states that the "expression of one thing [in the contract] is the exclusion of another." E. Farnsworth, Contracts § 7.11 (1982). Accordingly, if the parties to a contract list specific items in the contract, then the parties intended to exclude other unenumerated items. The contracts at issue specifically include certain enumerated services for which the plaintiffs are to be compensated. *See supra* pp. 705–09. In accordance with this maxim, this court concludes that the inclusion of the listed items as services

for which the plaintiffs are to be compensated, *see supra* p. 721 (quoting paragraph 19 of the National Hockey League Standard Player's Contract), was intended to be exclusive of others which, in some instances, in the case currently before the court, are properly referred to in the contracts at issue as contractual conditions.

### Conclusion

For the reasons discussed above, the plaintiffs' Motion for Partial Summary Judgment is, hereby, DENIED and the Cross–Motion of the United States for Partial Summary Judgment is, hereby, GRANTED.

IT IS SO ORDERED.