CAPITAL PROPERTIES, INC. and
Metropark, Ltd., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 99–954 C.

United States Court of Federal Claims.

April 25, 2003.

William F. Krebs, Washington, D.C., attorney of record for the plaintiffs. Edward D. Greenberg and David K. Monroe, of counsel, Washington, D.C. Gerald J. Petros, of counsel, Providence, Rhode Island.

Allison A. Page, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., David M. Cohen, Director, Todd M. Hughes, Assistant Director, for the defendant. Gareth W. Rosenau, Washington, D.C., for Federal Railroad Administration.

## *OPINION*

MEROW, Senior Judge.

Plaintiffs, Capital Properties, Inc. and Metropark, Ltd. (collectively, "CPI"), maintain and operate a parking garage at the railroad station in Providence, Rhode Island. CPI seeks money damages pursuant to 28 U.S.C. § 1491(a) alleging that the Federal Railroad Administration ("FRA") breached the terms of its contract by failing to approve its requests to increase certain parking rates at the Providence facility. Plaintiff also alleges that defendant breached the implied covenant of good faith and fair dealing. The main dispute between the parties is whether CPI is required to seek prior FRA approval for changes in non-Amtrak parking rates. The matter is before the court on the parties' cross-motions for summary judgment pursu-

ant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). For the reasons stated below, defendant's motion is GRANTED.

## Background

The following facts are undisputed unless otherwise noted. In 1976, Congress enacted the Railroad Revitalization and Regulatory Reform Act ("4R Act"), Pub.L. No. 94–210, 90 Stat. 33 (1976), *codified at* 45 U.S.C. §§ 801–855, to improve the infrastructure and financial stability of the national railway. Under Title VII of the 4R Act, the Secretary of Transportation ("Secretary") delegated to FRA authority to implement the Northeast Corridor Improvement Project ("NECIP") to improve Amtrak's facilities used for high-speed intercity rail passenger service between Boston, Massachusetts and Washington, D.C. The Northeast Corridor is used for both high-speed intercity passenger service as well as commuter and freight service.[1] FRA acted under the authority of the 4R Act to improve the Providence railroad station.

In order to carry out improvements to the Providence station, FRA and CPI entered into the Providence Rail Relocation Project Cooperative Agreement ("Cooperative Agreement").[2] The Cooperative Agreement provided for the relocation of Amtrak's rail passenger station and associated mainline right-of-way in Providence, and construction of certain integrally related improvements, as part of the implementation of the NECIP. Under the Cooperative Agreement, CPI provided the land for the relocated railroad station and the construction of a parking garage. The parking facility was a "Cost–Shared Improvement" whereby CPI and FRA each contributed 50% of the construction costs.[3] As part of the Cooperative

Agreement, FRA and CPI are parties to the Parking Facility Maintenance and Operation Agreement ("Parking Agreement").

The Parking Agreement has three purposes:

(a) to insure that there will be adequate capacity in the completed Parking Facility for users of intercity rail passenger service, at rates that will not discourage such use;

(b) to insure that rail passengers will not be discriminated against in the operation of and setting of rates for the Parking Facility; and

(c) to protect FRA's investment in the Parking Facility.

Parking Agreement § 2.

Pursuant to the Parking Agreement, CPI and FRA initially agreed upon a two-tiered public parking rate schedule, with one rate for Amtrak customers and one for all other public users. CPI's ability to adjust public parking rates is governed by section 6(b) of the Parking Agreement, which states:

Except as provided in subsection (c) below, FRA or its designee shall have the right of prior approval of any changes in public parking rates. Any request by [CPI] for such a change shall be accompanied by appropriate justification. FRA or its designee shall not unreasonably withhold approval of such a request if the interests of intercity rail passengers are not adversely affected by the requested change.

Parking Agreement § 6(b).

Under subsection (c), CPI does not have to seek prior approval to increase parking rates for a period of less than nine hours, decrease

---

1. Section 701(c) of the 4R Act defines the Northeast Corridor as "the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, and Maryland, and the District of Columbia."

2. The Cooperative Agreement, dated January 27, 1982, is between the FRA, the State of Rhode Island ("the State"), the City of Providence, the Providence Redevelopment Agency, the Providence and Worcester Realty Company ("P & W"), and Amtrak. CPI is the successor-in-interest to P & W. For purposes of this opinion, P & W will be referred to as CPI.

3. 45 U.S.C. § 853(1)(B) provides that the NECIP shall be implemented by the Secretary in order to achieve the "improvement of nonoperational portions of stations (as determined by the Secretary in consultation with the National Railroad Passenger Corporation) used in intercity rail passenger service and of related facilities and fencing. Fifty percent of the cost of such improvements shall be borne by States (or local or regional transportation authorities) ...."

rates for a period of nine hours or more, or increase all parking rates in equal proportion by a percentage linked to the percentage increase in the Consumer Price Index since the last rate increase. The Parking Agreement also provides that "[CPI] shall not sell or reserve parking privileges or spaces through any monthly or other term contract or any other form of commitment ('contract spaces') without the express written approval of FRA or its designee, except that [CPI] may contract with Amtrak to provide parking for Amtrak station personnel." Parking Agreement § 7.

In or about 1988, CPI began to sell monthly and bi-weekly "commuter books" at a discounted monthly rate of $40 to passengers using the Massachusetts Bay Transportation Authority ("MBTA") service from Providence to Boston.[4] The "commuter books" consisted of twenty-three or twelve daily parking vouchers. Subsequently, CPI increased the discounted monthly rate over time to $80 without seeking prior approval from FRA. In September 1999, CPI announced that it was discontinuing the monthly discount for MBTA passengers, thereby raising the rate charged to MBTA passengers to approximately $192 per month.

The State of Rhode Island ("the State"), as a party to the Cooperative Agreement, brought suit against CPI in the United States District Court for the District of Rhode Island to enjoin the rate increase. *See Almond v. Capital Props., Inc.*, 212 F.3d 20 (1st Cir.2000). The State argued that under section 6 of the Parking Agreement, CPI could not increase the parking rates for MBTA passengers without prior FRA approval. On October 4, 1999, the district court enjoined CPI from eliminating the discount until it obtained prior approval or demonstrated that FRA unreasonably refused its request. On October 4, 1999, CPI requested FRA approval to terminate the discounted MBTA commuter rate program.

In its request, CPI contended that section 6 required FRA to approve a rate increase if the interests of intercity rail passengers

would not be adversely affected. CPI claimed that FRA should approve the rate increase because eliminating the monthly discount would only affect MBTA commuter passengers and therefore could not adversely affect the interests of Amtrak's intercity rail passengers. Instead, the proposed rate increase would actually result in fewer MBTA passengers using the garage and lead to more spaces available for intercity rail passengers. CPI relied upon the statutory definitions of "commuter service" and "intercity rail passenger service" in effect at the time the parties entered into the Cooperative and Parking Agreements:

> "Commuter service" means short-haul rail passenger service operated in metropolitan and suburban areas, whether within or across the geographical boundaries of a State, usually characterized by reduced fare, multiple ride, and commutation tickets and by morning and evening peak periods.

> "Intercity rail passenger service" means all rail passenger service other than commuter service.

45 U.S.C. § 502 (9,11) ("Rail Passenger Service Act of 1970" or "RPSA"), *as amended by,* Amtrak Improvement Act of 1981 ("1981 Amtrak Act"), Pub.L. No. 97–35 § 1173, 95 Stat. 689 (1981), *repealed by* Pub.L. No. 103–272 § 7(b), 108 Stat. 1379 (1994) *and recodified* at 49 U.S.C. § 24102(4–5) (1994).

On October 29, 1999, FRA denied CPI's request to terminate the monthly MBTA passenger discount. FRA claimed that MBTA and Amtrak passengers were both intercity rail passengers because they traveled from center-city Providence to center-city Boston. Thus, FRA asserted that it was denying CPI's request to ensure that there would be adequate capacity in the garage for users of intercity rail. In its letter, FRA stated that "[b]ecause MBTA passengers using the Garage are intercity rail passengers, the FRA considers their right to a reasonable parking rate to be an interest which the Agreement was designed to protect through the FRA approval process." Pl.'s Ex. J at 2. FRA

---

4. The MBTA began providing rail service from Providence to Boston at a time after the parties entered into the Cooperative Agreement.

noted that eliminating the discounted rate for MBTA passengers would result in a rate increase of approximately 141% for monthly users and 93% for half-monthly passengers. As such, FRA held that the rate increases were not justified under the Parking Agreement.

FRA also contended that denial of the proposed rate increase was necessary to prevent discrimination against rail passengers and protect its investment in the parking facility. FRA argued that under section 703(2) of Title VII of the 4R Act, one of its goals in contributing funds to improve the facility and build the parking garage was the "facilitation of improvements in and usage of rail commuter services, rail rapid transit, and local public transportation." Thus, FRA asserted that it also had an interest in protecting the rights of passengers of all rail services. FRA concluded that a "significant rate increase that discourages the use of the parking garage, and correspondingly the use of the station and the rail services and infrastructure, is exactly the type of scenario that retention of FRA parking rate increase approval authority was designed to avoid." Pl.'s Ex. J at 3.

In addition, FRA rejected CPI's request after receiving comments from the State, a member of the Cooperative Agreement. In a letter dated October 20, 1999, the State took the position that FRA could reject a proposed rate increase for any reason if it would adversely affect the interests of intercity rail passengers. App. to Def.'s Resp. to Pl.'s Mot. for Summ. J. and Cross Mot. for Summ. J. ("Def.'s App.") at A1. Conversely, if the interests of intercity rail passengers would not be adversely affected, FRA could reject CPI's request if it had a reasonable basis. The State contended that the passengers affected by the proposed rate increase were intercity rail passengers within the meaning of section 6 of the Parking Agreement because the rail service in question traveled between two cities and did not meet the statutory definition for "commuter service." Thus, the State submitted that FRA could reject CPI's request to eliminate the discounted rate increase for any reason. In the event that FRA considered the affected pas-

sengers to be commuter rail passengers, the State urged FRA to reject the rate increase as unreasonable. The State argued that the proposed increase would discriminate against rail passengers because it would result in a greater number of non-rail passengers and fewer spaces for MBTA passengers. Additionally, it asserted that the new rates would be well above market rates for monthly parking at nearby garages.

On June 30, 2000, CPI made a second request to increase the parking rates for MBTA rail passengers to match the rates charged to Amtrak passengers. Def.'s App. at A7. As a result, the monthly parking rate for MBTA passengers would be raised to $125 and bi-weekly rates would become $70. CPI asserted that the MBTA rates were well below rates charged to Amtrak customers as well as rates in nearby parking garages. On September 14, 2000, FRA approved the requested rate increase with two conditions. First, the MBTA rate proposal would be phased in with an immediate increase to $100 and a second increase to $125 in one year. Second, CPI could charge Amtrak and MBTA passengers parking rates no higher than the equivalent general parking rate for the same time period. FRA concluded that while the proposed rates were reasonable, an immediate increase was extreme and would result in fewer MBTA passengers using the parking facility. CPI alleges that FRA's failure to approve the rate increase without conditions breached the terms of section 6 of the Parking Agreement.

On August 22, 2000, CPI and the State entered into a consent judgment terminating the litigation in the United States District Court for the District of Rhode Island. The consent judgment enjoins CPI from increasing monthly or bi-weekly parking rates at the Providence station garage until it obtains prior approval or demonstrates that FRA approval was not required for MBTA rates. Both parties have now cross-moved for summary judgment on all counts.

## Discussion

### Standard of Review

### Motion for Summary Judgement

Summary judgment is appropriate "if the pleadings, depositions, answers to interroga-

tories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court does not make findings of fact, but rather decides if there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505 ("the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Summary judgment will not be granted "if the dispute is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

The court must resolve all reasonable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. The burden on the moving party for summary judgment, to demonstrate that there is no genuine issue of material fact, may be discharged if it can show "that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987) (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). The burden then shifts to the non-moving party to produce evidence setting forth specific facts that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### Contract Interpretation

Contract interpretation is a question of law that is properly resolved on summary judgment. *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998) (citing *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996)); *Bristol–Myers Squibb Co. v. United States,* 48 Fed.Cl. 350, 355 (2000). Contract interpretation begins with the plain language of the contract. *Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed.Cir.1998). The plain meaning of the contract language must be given "the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone*

*Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The principal objective in interpreting the contractual language is to discern the parties' intent at the time the contract was executed. *Winstar v. United States,* 64 F.3d 1531, 1538 (9th Cir.1995) (citing *Arizona v. United States,* 216 Ct.Cl. 221, 234, 575 F.2d 855, 863 (1978)), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

If the contract language is clear and unambiguous, a court will give the words their plain and ordinary meaning without resort to extraneous evidence. *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479 (Fed.Cir.1997). However, the court "may use extrinsic evidence for the limited purpose of explaining the circumstances affecting a contract by shedding light on the parties' objective intent." *City of Tacoma v. United States,* 38 Fed.Cl. 582, 589 (1997) (citing *Conoco Inc. v. United States,* 35 Fed. Cl. 309, 325 (1996)). Moreover, interpretation of the contract "must assure that no contract provision is made inconsistent, superfluous, or redundant." *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997).

### Parties' Contentions

In this case, the main issue is whether FRA acted within its contractual rights under the Parking Agreement in denying CPI's request to discontinue the MBTA parking rate discount. As a matter of contract interpretation, CPI argues that FRA has no approval authority over non-Amtrak parking rates. Therefore, the justifications given by FRA for withholding its consent were not contemplated in section 6 of the Parking Agreement. CPI claims that an interpretation that gives FRA approval authority over MBTA parking rates would be unreasonable in light of the purpose of subsection 2(a) of the Parking Agreement to provide adequate capacity for intercity rail passengers. Furthermore, plaintiff submits that the purposes of subsections 2(b)-(c) of the Parking Agreement to prevent discrimination against rail passengers in the setting of rates and to protect FRA's investment were only designed to protect the interests of intercity rail passengers. CPI relies upon the overall

goal of the NECIP to improve facilities used for or related to intercity rail passenger service. Thus, FRA should not have approval authority over MBTA parking rates because it would not serve any of the purposes of the Parking Agreement. According to plaintiff's interpretation, it "would be unreasonable for FRA to deny any rate increase request that did not adversely affect intercity rail passengers, and FRA shall not act unreasonably." Pl.'s Reply Br. in Supp. of Mot. for Summ. J. ("Pl.'s Reply") at 3.

Plaintiff contends that the definition of "intercity rail passenger service" has a well recognized meaning defined by the 4R Act that must be read into the contract. CPI states that the parties intended to use the term in this sense because the Cooperative Agreement cited the 4R Act as authority for FRA to improve the Providence facility. Under the Cooperative Agreement, CPI notes that "FRA is authorized by Title VII of the 4R Act to implement a Northeast Corridor Improvement Project ('NECIP') to improve facilities used for or related to intercity rail passenger service between Boston, Massachusetts, and Washington, D.C." Cooperative Agreement ¶ 1. CPI argues that the MBTA Boston–Providence service meets the statutory definition of commuter because it is short-haul service between two metropolitan areas, has peak service in morning and evening service, and offers reduced twelve-ride or unlimited ride monthly passes. 45 U.S.C. § 502. Applying these criteria, plaintiff contends that MBTA service is clearly commuter service within the meaning of section 6 of the Parking Agreement.

CPI maintains that MBTA is explicitly recognized as a provider of regional commuter service under Amtrak's authorizing statute. In the Northeast Rail Service Act of 1981 ("NRSA"), Pub.L. No. 97–35, § 1135(a)(3), 95 Stat. 646, 45 U.S.C. § 1104 (1981), Congress identified MBTA as one of the "commuter authorities" authorized to acquire the Consolidated Rail Corporation's ("Conrail") commuter rail services. Under section 506 of the RPSA, as enacted by section 1137 of the NRSA, Congress provided for the transfer of rail properties to commuter authorities such as MBTA. Section 103 of the RPSA, as enact-

ed by section 1173 of the NRSA, defines commuter authority as "any State, local, or regional authority, or other entity established for purposes of providing commuter service and includes ... the Massachusetts Bay Transportation Authority." 45 U.S.C. § 502(8); 45 U.S.C. § 1104(3). Therefore, plaintiff submits that an interpretation that MBTA commuters are "intercity rail passengers" would contradict the statutory definition that the parties intended to incorporate into the contract.

FRA asserts that its determination was within its contractual rights under section 6(b) of the Parking Agreement which provides that FRA "shall have the right of prior approval of any changes in public parking rates" and that any request shall be accompanied by "appropriate justification." Defendant argues that the plain language fails to make any distinction between intercity and commuter rail service. Instead, CPI's obligation to seek prior FRA approval for changes in public parking rates is limited only by those exceptions expressly listed in subsection (c). FRA contends that the inclusion of specific exceptions demonstrates that the parties did not intend to allow CPI to increase commuter parking rates without prior approval. *See Am. Satellite Co. v. United States*, 20 Cl.Ct. 710, 714 (1990) (citing *Favell v. United States*, 16 Cl.Ct. 700, 726 (1989)) ("If the parties list specific items in the contract, it can be assumed they intended to exclude other unenumerated items.").

Under defendant's interpretation, "where the rights of intercity rail passengers are affected, the FRA has been given complete discretion in its approval of rates; regarding all other rates charged at the garage, the FRA is simply required to act reasonably." Def.'s Resp. at 6. Assuming that MBTA is commuter service, FRA asserts that it offered reasonable justifications in support of its denial that were in accordance with the purposes of the Parking Agreement. First, its actions were necessary to ensure that rail passengers would not be discriminated against in setting parking rates. Parking Agreement § 2(b). Second, supporting commuter rail services is consistent with the stated purpose of protecting FRA's invest-

ment in the parking facility. Parking Agreement § 2(c). Finally, it acted reasonably in considering the views of others parties to the Cooperative Agreement such as the State. In the alternative, FRA asserts that the phrase "intercity rail passengers" in section 6(b) was intended to mean all rail passengers who travel between cities. Therefore, MBTA passengers are "intercity rail passengers" under the Parking Agreement because they travel between Providence and Boston. As such, FRA acted within its contractual rights in withholding consent for the proposed rate increases.

### Analysis

█ There is no dispute that the 4R Act incorporated the term "intercity rail passenger service" contained in 45 U.S.C. § 502. Indeed, it is well-settled that a particular word or phrase "appearing multiple times in a statutory provision should be given the same reading unless there is a clear congressional intent to the contrary." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 884 (Fed.Cir.1998) (citing *Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994)). In this case, it is even clearer where the two provisions have the same purpose. *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1379 (Fed.Cir.2001). Title VII of the 4R Act was one of several congressional attempts to resolve the continuing crisis in rail transportation in the Northeast Corridor. In the RPSA, Congress created Amtrak with the purpose of providing "intercity rail passenger service ... so as to fully develop the potential of modern rail service in meeting the Nation's intercity passenger transportation requirements." § 301, 84 Stat. 1330; 45 U.S.C. § 541. Congress directed the Secretary to designate a "basic system" of intercity rail passenger service for the whole country and provided that passenger service over any lines not included in the basic system would be discontinued.

The stated goal of the 4R Act was to "promote the revitalization of such railway system, so that this mode of transportation will remain viable in the private sector of the economy and will be able to provide energy-efficient, ecologically compatible transportation services with greater efficiency, effectiveness, and economy, through— ... implementation of the Northeast Corridor project." 45 U.S.C. § 801(a)(3). In Title VII of the 4R Act, Congress directed FRA to improve Amtrak's existing intercity rail passenger service within the Northeast Corridor to provide for the "establishment of regularly scheduled and dependable intercity rail passenger service between Boston, Massachusetts, ... and Washington, District of Columbia, ... including appropriate intermediate stops." 45 U.S.C. § 853(1)(A)(i). Amtrak was ordered to implement the NE-CIP consistent with the purposes of the RPSA and the Regional Rail Reorganization Act of 1973 ("3R Act").[5] 45 U.S.C. § 851(1). Under section 701, 45 U.S.C. § 851, Amtrak was authorized to acquire property, improve its rights-of-way, and improve its passenger stations "to enable improved high-speed rail passenger service to be provided between Boston, Massachusetts, and Washington, District of Columbia ...."

In the 1981 Amtrak Act, § 1172, 45 U.S.C. § 501a(13), Congress amended the RPSA to ensure the "coordination among the various users of the Northeast Corridor, particularly intercity and commuter passenger services." In the RPSA, as amended by section 1173 of the 1981 Amtrak Act, Congress defined intercity rail passenger service as "all rail passenger service other than commuter service." 45 U.S.C. § 502(11) (1981). Commuter service was defined as short-haul service characterized by "reduced fare, multiple ride, and commutation tickets and by morning and evening peak periods." 45 U.S.C. § 502(9) (1981). Thus, the RPSA, as amended, specifically defined intercity rail and commuter service in the context of the Northeast Corridor. As the 4R Act was designed to improve Amtrak's service within the Northeast Corridor, its definition of "intercity rail passenger

5. As part of the 3R Act, Pub.L. No. 93–236, Title II, § 206, 87 Stat. 994, 45 U.S.C. § 716(a)(3), Congress called for the "establishment of improved high-speed rail passenger service consonant with the recommendations of the Secretary in his report of September 1971, entitled 'Recommendations for Northeast Corridor Transportation.'"

service" was explicitly derived from the RPSA.

■ Even though the language of the Parking Agreement may be identical with that of the statute, contractual language can have a scope independent of the proper construction of the statute. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 678, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Breese Burners, Inc. v. United States*, 128 Ct.Cl. 649, 659, 121 F.Supp. 530, 536 (1954). Parties do not "necessarily endow statutory language in a contract with the scope of the statute, particularly when the same term may have variant meanings for different applications of the statute." *Skelly Oil*, 339 U.S. at 678, 70 S.Ct. 876. However, terms which appear in the Cooperative and Parking Agreements must be read consistently. *McAbee Constr., Inc., v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996) ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."); *Petrofsky v. United States*, 222 Ct. Cl. 450, 616 F.2d 494, 503 (1980). The rule that contract terms will be given their ordinary meaning is particularly applicable where the contract language is easily construed in harmony with the pertinent statute. *See Am. Science & Eng'g, Inc. v. United States*, 229 Ct.Cl. 47, 57, 663 F.2d 82, 88 (1981); *Timber Access Indus. Co. v. United States*, 213 Ct.Cl. 648, 658, 553 F.2d 1250, 1256 (1977); *Victory Constr. Co., Inc. v. United States*, 206 Ct.Cl. 274, 287, 510 F.2d 1379, 1386 (1975).

■ Read as a whole, the Cooperative and Parking Agreements unambiguously demonstrate that the parties intended to adopt the statutory definition of "intercity rail passengers." The parties entered into the Cooperative Agreement to improve the Providence station as part of implementation of the 4R Act. Under the Cooperative Agreement, FRA was "authorized by Title VII of the 4R Act to implement a Northeast Corridor Improvement Project ('NECIP') to improve facilities used for or related to intercity rail passenger service ...." Cooperative Agreement ¶ 1. FRA agreed to fund the "the construction of a new Providence rail passenger station as part of the NECIP, which will improve Northeast Corridor intercity rail passenger service to and through Providence ...." Cooperative Agreement ¶ 3. FRA's funding authority for the parking garage recognizes that "section 703(1)(B) of the 4R Act (45 U.S.C. § 853(1)(B)) sets as one of the goals of the NECIP the improvement of nonoperational portions of stations used in intercity rail passenger service and related facilities, providing that fifty percent of the costs of such improvements are borne by a non-Federal party." Cooperative Agreement ¶ 8.

As a party to the Cooperative Agreement, Amtrak was "organized and acting under the Rail Passenger Service Act (45 U.S.C. § 501 et seq.)." Cooperative Agreement at 1. The Providence facility was targeted for improvements because "Amtrak's railroad right-of-way through central Providence, Rhode Island, and Amtrak's Providence rail passenger station are facilities used in such intercity rail passenger service ...." Cooperative Agreement ¶ 2. In 1970, Congress enacted the RPSA to create the National Railroad Passenger Corporation ("Amtrak") in order to establish secure and reliable intercity rail passenger service. Under the RPSA, Amtrak was authorized to enter into contracts with railroads to relieve them of their responsibility to provide intercity rail service. 45 U.S.C. § 561. A railroad could then discontinue its intercity rail service only after complying with the notice provisions of the act. If the rail service was commuter, it was required to seek approval from the Interstate Commerce Commission ("ICC") or the state regulatory agencies.

In *Penn Cent. Transp. Co. Discontinuance or Change in Serv.*, 338 I.C.C. 318, 326 (1971), the ICC established six criteria of commuter service in order to determine whether it had jurisdiction over a particular rail service:

(1) The passenger service is primarily being used by patrons traveling on a regular basis either within a metropolitan area or between a metropolitan area and its suburbs; (2) The service is usually characterized by operations performed at morning and peak periods of travel; (3) The service usually honors commutation or multiple-

ride tickets at a fare reduced below the ordinary coach fare and carries the majority of its patrons on such a reduced fare basis; (4) The service makes several stops at short intervals either within a zone or along the entire route; (5) The equipment used may consist of little more than ordinary coaches; (6) The service should not extend more than 100 miles at the most, except in rare instances; although service over shorter distances may not be commuter or short haul within the meaning of the exclusion.

The ICC found that, applying these criteria, the Penn Central service in the Boston–Providence corridor was commuter service within the meaning of section 102(5)(A) of the RPSA.[6] *Penn Cent.,* 338 I.C.C. at 328 ("we view Penn Central's service between Boston and Providence as manifestly 'commuter and other short-haul' in mode, and thus beyond the reach of [the RPSA]."). The ICC later held that "'commuter and other short-haul service' could reflect an operation extending beyond a metropolitan area to another metropolitan area ...." *Penn Cent. Transp. Co.—Status of Passenger Serv.,* 338 I.C.C. 621, 637 (1971). As the parties expressly incorporated the statutory definition contained in the RPSA and referenced in the 4R Act into the Cooperative Agreement, it is this definition which must be used to interpret section 6 of the Parking Agreement. Viewing the evidence in the light most favorable to CPI, it appears that MBTA's Boston–Providence service meets the statutory definition of commuter service.

A thorough review of the documents demonstrates that there exists no genuine dispute of material facts in resolving whether FRA acted within its contractual rights in withholding or conditioning approval of CPI's proposed rate increases. In exchange for receiving 50% of the funding for the Providence parking facility, CPI agreed to numerous conditions regarding the operation of the parking garage. Specifically, CPI agreed that FRA approval was required for all public parking rates prior to the opening of the garage. Parking Agreement § 6(a). Although plaintiff asserts that the Parking Agreement does not provide for FRA approval authority over commuter parking rates, section 6(b) obligates CPI to seek FRA approval for any changes in public parking rates. CPI is also required to demonstrate that there is an "appropriate justification" for the parking rate increase.

Pursuant to the terms of the Parking Agreement, FRA clearly possessed the right to evaluate any proposed change in the public parking rates in accordance with its stated purposes. Thus, CPI is required to seek FRA approval for any increases in MBTA parking rates. Plaintiff's interpretation that it is not required to seek approval for changes in MBTA parking rates is entirely inconsistent with FRA's right of prior approval. Furthermore, FRA approval authority over MBTA parking rates is consistent with the purpose of the Parking Agreement to insure adequate parking for intercity rail passengers. If CPI were to structure MBTA rates in such a way that resulted in an adverse impact on the number of spaces available for intercity passengers to utilize the parking facility, FRA would clearly have right to withhold approval. Under section 7 of the Parking Agreement, CPI cannot sell monthly parking privileges without the express written approval of FRA. Prior FRA approval of monthly contracts, such as MBTA's "commuter books" is designed to preserve an adequate number of available spaces for intercity rail passengers.

There is no dispute that the proposed increases do not fall within any of the rights given to CPI to change public parking rates without approval under subsection 6(c). The Parking Agreement enumerated three express exceptions to CPI's obligation to seek FRA approval. The fact that the parties listed specific instances where CPI could adjust rates without FRA approval demonstrates that they intended CPI to seek approval in all other instances. It is generally recognized that where "certain things are

---

6. In the 3R Act, Pub.L. No. 93–236, 87 Stat. 986, 45 U.S.C. § 701, et seq., Congress created the Consolidated Rail Corporation ("Conrail") through the merger and acquisition of several bankrupt railroads in the Northeast Corridor, including Penn Central. Conrail formally began operations on April 1, 1976.

specified in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication." *Nicholson v. United States*, 29 Fed.Cl. 180, 196 (1993) (Citing GRISMORE ON CONTRACTS § 105, at 164); *United Pac. Ins. Co. v. United States*, 204 Ct.Cl. 686, 692, 497 F.2d 1402, 1405 (1974). As the maxim *Expressio Unius est Exclusio Alterius* states, "the expression of one thing [in the contract] is the exclusion of another." *Favell*, 16 Cl. Ct. at 726 (Citing E. Farnsworth, Contracts § 7.11 (1982)). None of the stated exceptions listed allows CPI to increase parking rates without FRA approval simply because the rate affects only commuter rail passengers. Plaintiff could have bargained for a provision granting it the right to increase non-Amtrak parking rates without prior FRA approval. Indeed, plaintiff contends that the addition of commuter service was contemplated at the time the parties entered into the agreement. Pl.'s Reply at 7, n. 4. Because the Parking Agreement does not include such limiting language, there is no such exception to plaintiff's obligation to seek prior FRA approval.

The only limitation subsection 6(b) places on FRA's right of prior approval is that FRA must not unreasonably withhold approval if the proposed rates do not adversely affect intercity passengers. That fact that such approval must not be unreasonably withheld further supports the conclusion that CPI must first seek such approval. The reasonableness of such a decision must be viewed in light of the purposes of the agreement, the interests of the various parties to the Cooperative Agreement, and considerations of fairness and commercial reasonableness. *See* BLACK'S LAW DICTIONARY 1265 (6th ed. 1990) (Defining reasonable as "fair, proper, just, moderate, suitable under the circumstances.").

FRA's denial of CPI's request to increase MBTA parking rates was consistent with the purpose of preventing discrimination against rail passengers in the setting of parking rates. Parking Agreement § 6(b). Although CPI claims that defendant has not previously shown an interest in the rates charged to MBTA passengers, FRA is not estopped from asserting its contractual rights. It is "well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Plaintiff must show "affirmative misconduct [as] a prerequisite for invoking equitable estoppel against the government." *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1377 (Fed.Cir.2003) (quoting *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir.2000)). The record fails to reveal any evidence demonstrating bad faith or affirmative misconduct on the part of FRA.

■ The plain language of the Parking Agreement applies to all rail passengers and fails to distinguish between intercity and commuter passengers. In its request, CPI sought to eliminate the MBTA rate program in order to take advantage of increasing demand for non-rail parking spaces. CPI argued that the existing MBTA rates were "unwarranted in light of the increased demand for parking in and around the Capital Center area." Pl.'s Ex. I. at 4. Thus, CPI hoped to replace MBTA passengers with non-rail users. As an interested party to the Cooperative Agreement, the State objected that the "proposed increase would effectively boot out the approximately 140 rail passengers who currently purchase monthly passes and leave the Garage populated almost exclusively with nonrail passenger parkers and the few overnight Amtrak passengers." Def.'s App. at A3. Based upon the documentation submitted by CPI and the State, FRA reasonably decided that the proposed rate increase would discourage use of the parking garage by MBTA passengers. Pl.'s Ex. J at 3. Therefore, FRA's conclusion that approving CPI's request for significant rate increases would unfairly discriminate against MBTA passengers in favor of non-rail users was reasonable.

Furthermore, FRA's denial was a reasonable decision to protect its investment in the Providence parking facility. FRA was charged with implementing the goals of the NECIP, including; to the extent compatible with its goals of improving intercity rail passenger service, "the facilitation of improvements in and usage of rail commuter ser-

vices, rail rapid transit, and local public transportation." 45 U.S.C. § 853(2). Under section 701 of the 4R Act, Amtrak was authorized to "provide for the continuous operation and maintenance of rail freight, intercity rail passenger, and commuter rail passenger service over the properties acquired pursuant to this section." 45 U.S.C. § 851(a)(3). While improving intercity rail service was the primary goal of the NECIP, Congress recognized that Amtrak's and FRA's investments would also substantially improve commuter rail passenger service. Under the Cooperative Agreement, FRA contributed 50% for the costs for a high-level commuter platform and platform access. Cooperative Agreement, Ex. III–1. Withholding approval for a rate increase that would negatively impact commuter passenger service was reasonable in view of its right to protect its investments.

It was clearly reasonable for FRA to seek comments on CPI's request from the State. Although the Parking Agreement was only between FRA and CPI, it was made a part of the overall Cooperative Agreement among all the interested parties. Cooperative Agreement § 606 ("Upon completion of the Parking Facility contemplated under this Agreement, [CPI] hereby covenants to comply fully with the terms of the [Parking Agreement] attached to and made a part of this Agreement, as Exhibit VI."). Furthermore, the Cooperative Agreement provided that the Parking Agreement "may be amended by action of FRA and [CPI] only, subject to review and comment by any other affected parties." Cooperative Agreement § 606. In granting an injunction enjoining any further rate increases, the United States District Court for the District of Rhode Island held that the State had standing to enforce the Parking Agreement because "Capital Properties is obligated to the state (directly and not merely as a third-party beneficiary) to seek prior approval from the FRA for increases in garage rates." *Almond*, 212 F.3d at 24.

As a party to the Cooperative Agreement, the State was responsible for design and construction of several projects, exchanged property, and contributed funds for the rail relocation project. The State's interest in a reasonable parking rate for commuter passengers is reflected in its funding contribution of 50% for a high-level commuter platform and platform access. Cooperative Agreement, Ex. III–1. As the State had an interest in any proposed changes to the Parking Agreement as well as ensuring that CPI seek prior FRA approval for rate increases, it was entirely reasonable for FRA to consider the States's view on CPI's requests.

In its denial, FRA concluded that the proposed rates were unreasonable in comparison to parking rates at other similarly funded garages in the Northeast Corridor. Pl.'s Ex. J. at 3. Even relying upon non-rail rates at nearby Providence garages, CPI's proposed monthly parking rate of approximately $192 would have exceeded market rates. *See* Def.'s App. at A10 (Comparison of monthly parking rates in the vicinity of the Providence rail station). While CPI is not required to charge non-Amtrak rates unconscionably below market rates, it is not unreasonable to withhold approval of a large rate increase that would exceed rates at comparable garages and discourage rail passengers from using the parking facility. Thus, FRA had a reasonable basis for withholding consent to CPI's October 4, 1999 request based on its conclusion that the proposed rates would exceed comparable rates at nearby garages, and to condition the impact of the increased rates it subsequently did approve.

### Conclusion

Accordingly, it is **ORDERED**:

(1) Plaintiff's Motion for Summary Judgment is **DENIED**;

(2) Defendant's Motion for Summary Judgment is **GRANTED**;

(3) Final Judgment shall be entered **DISMISSING** the Complaint, with **NO COSTS** assessed.